# LUBIN *v.* PANISH, REGISTRAR–RECORDER OF COUNTY OF LOS ANGELES

No. 71–6852.   Argued October 9, 1973—Decided March 26, 1974

BURGER, C. J., delivered the opinion of the Court, in which DOUG-LAS, BRENNAN, STEWART, WHITE, MARSHALL, and POWELL, JJ., joined. DOUGLAS, J., filed a concurring opinion, *post*, p. 719. BLACKMUN, J., filed an opinion concurring in part, in which REHN-QUIST, J., joined, *post*, p. 722.

*Marguerite M. Buckley* argued the cause for petitioner. With her on the briefs were *A. L. Wirin* and *Fred Okrand.*

*Edward H. Gaylord* argued the cause for respondent. With him on the brief was *John H. Larson.*

Mr. Chief Justice Burger delivered the opinion of the Court.

We granted certiorari to consider petitioner's claim that the California statute requiring payment of a filing fee of $701.60 in order to be placed on the ballot in the primary election for nomination to the position of County Supervisor, while providing no alternative means of access to the ballot, deprived him, as an indigent person unable to pay the fee, and others similarly situated, of the equal protection guaranteed by the Fourteenth Amendment and rights of expression and association guaranteed by the First Amendment.

The California Elections Code provides that forms required for nomination and election to congressional, state, and county offices are to be issued to candidates only upon prepayment of a nonrefundable filing fee. Cal. Elections Code § 6551. Generally, the required fees are fixed at a percentage of the salary for the office sought. The fee for candidates for United States Senator, Governor, and other state offices and some county offices, is 2% of the annual salary. Candidates for Representative to Congress, State Senator or Assemblyman, or for judicial office or district attorney, must pay 1%. No filing fee is required of candidates in the presidential primary, or for offices which pay either no fixed salary or not more than $600 annually. §§ 6551, 6552, and 6554.

Under the California statutes in effect at the time this suit was commenced, the required candidate filing fees ranged from $192 for State Assembly, $425 for Congress, $701.60 for Los Angeles County Board of Supervisors, $850 for United States Senator, to $982 for Governor.

The California statute provides for the counting of write-in votes subject to certain conditions. § 18600

*et seq.* (Supp. 1974). Write-in votes are not counted, however, unless the person desiring to be a write-in candidate files a statement to that effect with the Registrar-Recorder at least eight days prior to the election, § 18602, and pays the requisite filing fee, § 18603. The latter section provides that "[n]o name written upon a ballot in any state, county, city, city and county, or district election shall be counted for an office or nomination unless . . . [t]he fee required by Section 6555 is paid when the declaration of write-in candidacy is filed . . . ." Thus, the contested filing fees must be satisfied even under the write-in nomination procedures.

Petitioner commenced this class action on February 17, 1972, by petitioning the Los Angeles Superior Court for a writ of mandate against the Secretary of State and the Los Angeles County Registrar-Recorder. The suit was filed on behalf of petitioner and all those similarly situated persons who were unable to pay the filing fees and who desired to be nominated for public office. In his complaint, petitioner maintained that he was a citizen and a voter and that he had sought nomination as a candidate for membership on the Board of Supervisors of Los Angeles County.[1] Petitioner asserted that on February 15, 1972, he had appeared at the office of James S. Allison, then Registrar-Recorder of the County of Los Angeles, to apply for and secure all necessary nomination papers requisite to his proposed candidacy. Petitioner was denied the requested nomination papers orally and in writing solely because he was unable to pay the $701.60 filing fee required of all would-be candidates for the office of Board of Supervisors.

---

[1] The Board of Supervisors of Los Angeles County is the governing body for Los Angeles County, California. The term is four years, the annual salary $35,080.

The Los Angeles Superior Court denied the requested writ of mandate on March 6, 1972. Petitioner alleged that he was a serious candidate, that he was indigent, and that he was unable to pay the $701.60 filing fee; no evidence was taken during the hearing. The Superior Court found the fees to be "reasonable, as a matter of law." Accordingly, the court made no attempt to determine whether the fees charged were necessary to the State's purpose, or whether the fees, in addition to deterring some frivolous candidates, also prohibited serious but indigent candidates from entering their names on the ballot. The Superior Court also rejected the argument that the State was required by *Bullock* v. *Carter*, 405 U. S. 134 (1972), to provide an alternative means of access to the ballot which did not discriminate on the basis of economic factors.

On March 9, 1972, a second petition for writ of mandate was denied by the Court of Appeal, Second District, and on March 22, 1972, after the deadline for filing nomination papers had passed, the California Supreme Court denied petitioner's third application for a writ of mandate.

Historically, since the Progressive movement of the early 20th century, there has been a steady trend toward limiting the size of the ballot in order to "concentrate the attention of the electorate on the selection of a much smaller number of officials and so afford to the voters the opportunity of exercising more discrimination in their use of the franchise." [2] This desire to limit the size of the ballot has been variously phrased as a desire to minimize voter confusion, *Thomas* v. *Mims*, 317 F. Supp. 179, 181 (SD Ala. 1970), to limit the number of runoff elections, *Spillers* v. *Slaughter*, 325 F. Supp. 550, 553 (MD

---

[2] H. Croly, Progressive Democracy 289 (1914).

Fla. 1971), to curb "ballot flooding," *Jenness* v. *Little,* 306 F. Supp. 925, 927 (ND Ga. 1969), appeal dismissed *sub nom. Matthews* v. *Little,* 397 U. S. 94 (1970), and to prevent the overwhelming of voting machines—the modern counterpart of ballot flooding, *Wetherington* v. *Adams,* 309 F. Supp. 318, 321 (ND Fla. 1970). A majority of States have long required the payment of some form of filing fee,[3] in part to limit the ballot and in part to have candidates pay some of the administrative costs.

In sharp contrast to this fear of an unduly lengthy ballot is an increasing pressure for broader access to the ballot. Thus, while progressive thought in the first half of the century was concerned with restricting the ballot to achieve voting rationality, recent decades brought an enlarged demand for an expansion of political opportunity. The Twenty-fifth Amendment, the Twenty-sixth Amendment, and the Voting Rights Act of 1965, 79 Stat. 437, 42 U. S. C. § 1973 *et seq.,* reflect this shift in emphasis. There has also been a gradual enlargement of the Fourteenth Amendment's equal protection provision in the area of voting rights:

"It has been established in recent years that the Equal Protection Clause confers the substantive right to participate on an equal basis with other qualified voters whenever the State has adopted an electoral process for determining who will represent any segment of the State's population. See, *e. g., Reynolds* v. *Sims,* 377 U. S. 533; *Kramer* v. *Union School District,* 395 U. S. 621; *Dunn* v. *Blumstein,* 405 U. S. 330, 336." *San Antonio School District* v.

---

[3] See Comment, The Constitutionality of Qualifying Fees for Political Candidates, 120 U. Pa. L. Rev. 109 (1971), for a detailed description of each State's filing-fee requirements.

*Rodriguez,* 411 U. S. 1, 59 n. 2 (1973) (STEWART, J., concurring).

This principle flows naturally from our recognition that

"[l]egislators are elected by voters, not farms or cities or economic interests. As long as ours is a representative form of government, and our legislatures are those instruments of government elected directly by and directly representative of the people, the right to elect legislators in a free and unimpaired fashion is a bedrock of our political system." *Reynolds* v. *Sims,* 377 U. S. 533, 562 (1964) (Warren, C. J.).

The present case draws these two means of achieving an effective, representative political system into apparent conflict and presents the question of how to accommodate the desire for increased ballot access with the imperative of protecting the integrity of the electoral system from the recognized dangers of ballots listing so many candidates as to undermine the process of giving expression to the will of the majority. The petitioner stated on oath that he is without assets or income and cannot pay the $701.60 filing fee although he is otherwise legally eligible to be a candidate on the primary ballot. Since his affidavit of indigency states that he has no resources and earned no income whatever in 1972, it would appear that he would make the same claim whether the filing fee had been fixed at $1, $100, or $700. The State accepts this as true but defends the statutory fee as necessary to keep the ballot from being overwhelmed with frivolous or otherwise nonserious candidates, arguing that as to indigents the filing fee is not intended as a test of his pocketbook but the extent of his political support and hence the seriousness of his candidacy.

In *Bullock* v. *Carter*, 405 U. S. 134 (1972),[4] we recognized that the State's interest in keeping its ballots within manageable, understandable limits is of the highest order. *Id.*, at 144–145. The role of the primary election process in California is underscored by its importance as a component of the total electoral process and its special function to assure that fragmentation of voter choice is minimized. That function is served, not frustrated, by a procedure that tends to regulate the filing of frivolous candidates. A procedure inviting or permitting every citizen to present himself to the voters on the ballot without some means of measuring the seriousness of the candidate's desire and motivation would make rational voter choices more difficult because of the size of the ballot and hence would tend to impede the electoral process. That no device can be conjured to eliminate every frivolous candidacy does not undermine the State's effort to eliminate as many such as possible.

That "laundry list" ballots discourage voter participation and confuse and frustrate those who do participate is too obvious to call for extended discussion. The means of testing the seriousness of a given candidacy may be open to debate; the fundamental importance of ballots of reasonable size limited to serious candidates with some prospects of public support is not. Rational results within the framework of our system are not likely

---

[4] *Bullock*, of course, does not completely resolve the present attack upon the California election statutes because it involved filing fees that were so patently exclusionary as to violate traditional equal protection concepts. Cf. *Rosario* v. *Rockefeller*, 410 U. S. 752, 760 (1973); *James* v. *Strange*, 407 U. S. 128 (1972); *Rinaldi* v. *Yeager*, 384 U. S. 305 (1966). Under attack in *Bullock* was a Texas statute that required candidates to pay a flat fee of $50 plus their pro rata share of the costs of the election in order to get on the primary ballot. Tex. Election Code, Art. 13.07a (Supp. 1974). The assessment of costs involved sums as high as $8,900.

to be reached if the ballot for a single office must list a dozen or more aspirants who are relatively unknown or have no prospects of success.

This legitimate state interest, however, must be achieved by a means that does not unfairly or unnecessarily burden either a minority party's or an individual candidate's equally important interest in the continued availability of political opportunity. The interests involved are not merely those of parties or individual candidates; the voters can assert their preferences only through candidates or parties or both and it is this broad interest that must be weighed in the balance. The right of a party or an individual to a place on a ballot is entitled to protection and is intertwined with the rights of voters.

> "[T]he right to vote is heavily burdened if that vote may be cast only for one of two parties at a time when other parties are clamoring for a place on the ballot." *Williams* v. *Rhodes*, 393 U. S. 23, 31 (1968).

This must also mean that the right to vote is "heavily burdened" if that vote may be cast only for one of two candidates in a primary election at a time when other candidates are clamoring for a place on the ballot. It is to be expected that a voter hopes to find on the ballot a candidate who comes near to reflecting his policy preferences on contemporary issues. This does not mean every voter can be assured that a candidate to his liking will be on the ballot, but the process of qualifying candidates for a place on the ballot may not constitutionally be measured solely in dollars.

In *Bullock, supra,* we expressly rejected the validity of filing fees as the sole means of determining a candidate's "seriousness":

> "To say that the filing fee requirement tends to limit

the ballot to the more serious candidates is not enough. There may well be some rational relationship between a candidate's willingness to pay a filing fee and the seriousness with which he takes his candidacy, but the candidates in this case affirmatively alleged that they were *unable,* not simply *unwilling,* to pay the assessed fees, and there was no contrary evidence. It is uncontested that the filing fees exclude legitimate as well as frivolous candidates. . . . If the Texas fee requirement is intended to regulate the ballot by weeding out spurious candidates, it is extraordinarily ill-fitted to that goal; other means to protect those valid interests are available." 405 U. S., at 145–146. (Emphasis in original.) (Footnotes omitted.)

Filing fees, however large, do not, in and of themselves, test the genuineness of a candidacy or the extent of the voter support of an aspirant for public office. A large filing fee may serve the legitimate function of keeping ballots manageable but, standing alone, it is not a certain test of whether the candidacy is serious or spurious. A wealthy candidate with not the remotest chance of election may secure a place on the ballot by writing a check. Merchants and other entrepreneurs have been known to run for public office simply to make their names known to the public. We have also noted that prohibitive filing fees, such as those in *Bullock,* can effectively exclude serious candidates. Conversely, if the filing fee is more moderate, as here, impecunious but serious candidates may be prevented from running. Even in this day of high-budget political campaigns some candidates have demonstrated that direct contact with thousands of voters by "walking tours" is a route to success. Whatever may be the political mood at any given time, our

tradition has been one of hospitality toward all candidates without regard to their economic status.

The absence of any alternative means of gaining access to the ballot inevitably renders the California system exclusionary as to some aspirants. As we have noted, the payment of a fee is an absolute, not an alternative, condition, and failure to meet it is a disqualification from running for office. Thus, California has chosen to achieve the important and legitimate interest of maintaining the integrity of elections by means which can operate to exclude some potentially serious candidates from the ballot without providing them with any alternative means of coming before the voters. Selection of candidates solely on the basis of ability to pay a fixed fee without providing any alternative means is not reasonably necessary to the accomplishment of the State's legitimate election interests. Accordingly, we hold that in the absence of reasonable alternative means of ballot access, a State may not, consistent with constitutional standards, require from an indigent candidate filing fees he cannot pay.

In so holding, we note that there are obvious and well-known means of testing the "seriousness" of a candidacy which do not measure the probability of attracting significant voter support solely by the neutral fact of payment of a filing fee. States may, for example, impose on minor political parties the precondition of demonstrating the existence of some reasonable quantum of voter support by requiring such parties to file petitions for a place on the ballot signed by a percentage of those who voted in a prior election. See *American Party of Texas* v. *White, post,* p. 767. Similarly, a candidate who establishes that he cannot pay the filing fee required for a place on the primary ballot may be required to demonstrate the "seriousness" of his candidacy by persuading

a substantial number of voters to sign a petition in his behalf.[5]  The point, of course, is that ballot access must be genuinely open to all, subject to reasonable requirements.  *Jenness* v. *Fortson,* 403 U. S. 431, 439 (1971).  California's present system has not met this standard.

Reversed and remanded for further consideration not inconsistent with this opinion.

*It is so ordered.*

MR. JUSTICE DOUGLAS, concurring.

While I join the Court's opinion I wish to add a few words, since in my view this case is clearly controlled by prior decisions applying the Equal Protection Clause to wealth discriminations.  Since classifications based on wealth are "traditionally disfavored," *Harper* v. *Virginia Bd. of Elections,* 383 U. S. 663, 668 (1966), the State's inability to show a compelling interest in conditioning the right to run for office on payment of fees cannot stand.  *Bullock* v. *Carter,* 405 U. S. 134 (1972).

The Court first began looking closely at discrimination against the poor in the criminal area.  In *Griffin*

---

[5] It is suggested that a write-in procedure, under § 18600 *et seq.,* without a filing fee would be an adequate alternative to California's present filing-fee requirement.  The realities of the electoral process, however, strongly suggest that "access" via write-in votes falls far short of access in terms of having the name of the candidate on the ballot.  It would allow an affluent candidate to put his name before the voters on the ballot by paying a filing fee while the indigent, relegated to the write-in provision, would be forced to rest his chances solely upon those voters who would remember his name and take the affirmative step of writing it on the ballot.  That disparity would, itself, give rise to constitutional questions and, although we need not decide the issue, the intimation that a write-in provision without the filing fee required by § 18600 *et seq.* would constitute "an acceptable alternative" appears dubious at best.

v. *Illinois,* 351 U. S. 12 (1956), we found that *de facto* denial of appeal rights by an Illinois statute requiring purchase of a transcript denied equal protection to indigent defendants since there "can be no equal justice where the kind of trial a man gets depends on the amount of money he has." *Id.,* at 19. In *Douglas* v. *California,* 372 U. S. 353 (1963), we found that the State had drawn "an unconstitutional line . . . between rich and poor" when it allowed an appellate court to decide an indigent's case on the merits although no counsel had been appointed to argue his case before the appellate court. Just recently we found that the State could not extend the prison term of an indigent for his failure to pay an assessed fine, since the length of confinement could not under the Equal Protection Clause be made to turn on one's ability to pay. *Williams* v. *Illinois,* 399 U. S. 235 (1970); see *Tate* v. *Short,* 401 U. S. 395 (1971). But criminal procedure has not defined the boundaries within which wealth discriminations have been struck down. In *Boddie* v. *Connecticut,* 401 U. S. 371 (1971), the majority found that the filing fee which denied the poor access to the courts for divorce was a denial of due process; MR. JUSTICE BRENNAN and I in concurrence preferred to rest the result on equal protection. And it was the Equal Protection Clause the majority relied on in *Lindsey* v. *Normet,* 405 U. S. 56, 79 (1972), in finding that Oregon's double-bond requirement for appealing forcible entry and detainer actions discriminated against the poor: "For them, as a practical matter, appeal is foreclosed, no matter how meritorious their case may be."

Indeed, the Court has scrutinized wealth discrimination in a wide variety of areas. In *Shapiro* v. *Thompson,* 394 U. S. 618, 633 (1969), we found that deterring indigents from migrating into the State was not a constitu-

tionally permissible state objective. Closer to the case before us here was *Turner* v. *Fouche,* 396 U. S. 346, 362–364 (1970), in which the Court found that Georgia could not constitutionally require ownership of land as a qualification for membership on a county board of education. See *Kramer* v. *Union Free School Dist.,* 395 U. S. 621 (1969); *Cipriano* v. *Houma,* 395 U. S. 701 (1969). In *Harper* v. *Virginia Bd. of Elections, supra,* we found a state poll tax violative of equal protection because of the burden it placed on the poor's exercise of the franchise. And in *Bullock* v. *Carter, supra,* we invalidated a Texas filing fee system virtually indistinguishable from that presented here.

What we do today thus involves no new principle, nor any novel application. "[A] man's mere property status, without more, cannot be used by a state to test, qualify, or limit his rights as a citizen of the United States." *Edwards* v. *California,* 314 U. S. 160, 184 (1941) (Jackson, J., concurring). Voting is clearly a fundamental right.* *Harper* v. *Virginia Bd. of Elections, supra,* at 667; *Reynolds* v. *Sims,* 377 U. S. 533, 561–562 (1964). But the

---

*"No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined." *Wesberry* v. *Sanders,* 376 U. S. 1, 17 (1964).

*Wesberry* involved a federal election. Article I, § 2, of the Federal Constitution declares that Members of the House should be "chosen every second Year by the People of the several States"; and the Seventeenth Amendment says that Senators shall be "elected by the people." But the right to vote in state elections is one of the rights historically "retained by the people" by virtue of the Ninth Amendment as well as included in the penumbra of First Amendment rights. As MR. JUSTICE BRENNAN stated in *Storer* v. *Brown, post,* at 756, "The right to vote derives from the right of association that is at the core of the First Amendment, protected from state infringement by the Fourteenth Amendment." (Dissenting opinion.)

right to vote would be empty if the State could arbitrarily deny the right to stand for election. California does not satisfy the Equal Protection Clause when it allows the poor to vote but effectively prevents them from voting for one of their own economic class. Such an election would be a sham, and we have held that the State must show a compelling interest before it can keep political minorities off the ballot. *Williams* v. *Rhodes,* 393 U. S. 23, 31 (1968). The poor may be treated no differently.

MR. JUSTICE BLACKMUN, with whom MR. JUSTICE REHNQUIST joins, concurring in part.

For me, the difficulty with the California election system is the absence of a realistic alternative access to the ballot for the candidate whose indigency renders it impossible for him to pay the prescribed filing fee.

In addition to a proper petitioning process suggested by the Court in its opinion, *ante,* at 718, I would regard a write-in procedure, free of fee, as an acceptable alternative. Prior to 1968, California allowed this, and write-in votes were counted, although no prior fee had been paid. But the prior fee requirement for the write-in candidate was incorporated into the State's Elections Code in that year, Laws 1968, c. 79, § 3, and is now § 18603 (b) of the Code. It is that addition, by amendment, that serves to deny the petitioner the equal protection guaranteed to him by the Fourteenth Amendment. Section 18603 (b) appears to be severable. See *Frost* v. *Corporation Comm'n,* 278 U. S. 515, 525–526 (1929); *Truax* v. *Corrigan,* 257 U. S. 312, 341–342 (1921). The Code itself provides for severability. Cal. Elections Code § 48. That, however, is an issue for the California courts to decide.

I would hold that the California election statutes are unconstitutional insofar as they presently deny access to the ballot. If § 18603 (b) were to be stricken, the Code, as before, would permit write-in access with no prior fee. The presence of that alternative, although not perfect, surely provides the indigent would-be candidate with as much ease of access to the ballot as the alternative of obtaining a large number of petition signatures in a relatively short time. See *Storer* v. *Brown, post,* at 738–746. The Court seemingly would reject a write-in alternative while accepting many petition alternatives. In my view, a write-in procedure, such as California's before 1968, satisfies the demands of the Equal Protection Clause as well as most petitioning procedures. I, therefore, join the Court in reversing the order of the Supreme Court of California denying petitioner's petition for writ of mandate and in remanding the case for further proceedings.