[Civ. No. 14015. Third Dist. Sept. 30, 1974.]

SUSAN MASON SMITH et al., Plaintiffs and Appellants, v.
BARBARA EVANS, as City Clerk, etc., Defendant and Respondent.

## COUNSEL

M. Brooks Houghton and Ann R. Houghton for Plaintiffs and Appellants.

Grayson Price, City Attorney, and Philip B. Price, Deputy City Attorney, for Defendant and Respondent.

## OPINION

**FRIEDMAN, J.**—This appeal involves the constitutionality of a city charter provision establishing a one-year residence requirement for city council candidates.[1]

The petitioners, Susan Smith and Tom Lundy, commenced a superior court mandate proceeding against the Chico City Clerk. Both alleged that they had requested nomination papers to qualify as city council candidates at the municipal election to be held April 3, 1973. The clerk had refused their requests because they could not fulfill the city charter's demand for one year's residence preceding January 25, 1973, the closing date for nominations. Susan Smith had become a Chico city resident in June 1972, about seven months before close of the nomination period. Tom Lundy had also moved into the city in June 1972. Before then, each had lived just outside the city boundaries. The superior court entered a judgment denying relief and this appeal followed.

■ Although the election is past, the one-year residence requirement of the Chico City Charter persists. Its constitutionality affects future elections in Chico and other political entities having similar residence provisions. One-year candidate residence requirements appear in statutes regulating candidacy in nonchartered counties and cities.[2] They doubtless characterize a number of county and city charters, as well as laws governing special districts. Under the circumstances, a judicial decision is appropriate. (*Ramirez* v. *Brown* (1973) 9 Cal.3d 199, 203 [107 Cal. Rptr. 137, 507 P.2d 1345].)

### I

In *Zeilenga* v. *Nelson* (1971) 4 Cal.3d 716 [94 Cal.Rptr. 602, 484 P.2d 578], *Camara* v. *Mellon* (1971) 4 Cal.3d 714 [94 Cal.Rptr. 601, 484

---

[1]The provision is found in section 403 of the Charter of the City of Chico. It declares: "Candidates for city councilman shall have all of the following qualifications at the time of filing nomination papers:

"(a) have resided in the city for a period of one year, and

"(b) be over the age of twenty-one years, and

"(c) be a qualified voter as defined by the Elections Code of the State of California." (Stats. 1971, Res. ch. 96, pp. 4290-4291.)

[2]In nonchartered counties, each supervisor "shall have been an elector of the district which he represents for at least one year immediately preceding his election . . . ." (Gov. Code, § 25041.)

In general law cities, "A person is not eligible to hold office as councilman, city clerk, or city treasurer unless he . . . has resided in the city for the year preceding his election." (Gov. Code, § 36502.)

P.2d 577], and *Thompson* v. *Mellon* (1973) 9 Cal.3d 96 [107 Cal.Rptr. 20, 507 P.2d 628], the California Supreme Court invalidated residence duration requirements of five, three and two years, respectively, for county or city candidates. These residence requirements, according to these decisions, treat some persons differently than others, infringing the fundamental rights to seek office and to travel; the equal protection clause of the Fourteenth Amendment requires "strict scrutiny" of such a classification, which may be sustained only if necessary to achieve "a compelling governmental interest;" the residence requirements failed to promote candidates' familiarity with community conditions and issues; they discriminated against newcomers without fulfilling a compelling governmental interest; hence they denied equal protection of the laws.

The absence of a majority opinion in *Thompson* v. *Mellon, supra,* 9 Cal.3d 96, causes lack of firm decisional guidance. The leading opinion (by Sullivan, J., with Tobriner, J., concurring) nullifies a two-year residence requirement and suggests that a charter or statute may constitutionally require no more than 30 days' residence before the candidate files his nominating papers. An opinion signed by Wright, C.J., and Molinari, J., concurs in the judgment of invalidity without suggesting what would be a constitutionally permissible demand. A concurring opinion by Mosk, J., concludes that any person eligible to vote at the election should be eligible for candidacy at that election. A dissenting opinion (signed by Burke, J., and McComb, J.,) would have sustained the two-year provision as a valid exercise of home rule. Five of the seven participating justices joined in nullifying the two-year residence provision, but less than a majority joined in expressions reflecting adversely upon a one-year residence requirement. The latter expressions thus have no precedential force. *(North* v. *Superior Court* (1972) 8 Cal.3d 301, 307-308 [104 Cal.Rptr. 833, 502 P.2d 1305].) We seek additional enlightenment in related federal and California decisions.

In *Gage* v. *Allison* (1971) 22 Cal.App.3d 85 [99 Cal.Rptr. 95], the Court of Appeal, Second District, Division Four, rejected an equal protection attack upon a Los Angeles County Charter provision requiring supervisorial candidates to have one year's "elector" status within the supervisorial district. The state Supreme Court denied a petition for hearing in *Gage* v. *Allison*. According to the opinion, the Court of Appeal believed itself bound by *Lindsey* v. *Dominguez* (1933) 217 Cal. 533 [20 P.2d 327], which had sustained a two-year residence requirement for city council candidates. The latter, however, was not reliable authority. Earlier, the state Supreme Court had denigrated *Lindsey*, observing

that it "was decided long before the 'compelling interest' test was applied to the franchise . . . ." (*Zeilenga* v. *Nelson, supra,* 4 Cal.3d at p. 723, fn. 3.) Later, in *Wenke* v. *Hitchcock* (1972) 6 Cal.3d 746, 755 [100 Cal. Rptr. 290, 493 P.2d 1154], and *Thompson* v. *Mellon, supra,* 9 Cal.3d at page 106, footnote 6, the Supreme Court overruled *Lindsey,* virtually obliterating the *ratio decidendi* of *Gage* v. *Allison* and devitalizing its own denial of a hearing in that case. Because it relied on the now overruled *Lindsey* decision, we do not view *Gage* v. *Allison* as persuasive authority.[3]

Decisions involving constitutionality of voter (as distinguished from candidate) residence laws are significant, because the rights to vote and to seek office are closely related attributes of citizenship. The federal and California Supreme Courts have invalidated state laws denying the vote to recent arrivals, declaring that the equal protection guaranty exposed such laws to "strict scrutiny" by the courts, which would invalidate them unless they fulfilled a "compelling governmental interest." Thus the federal Supreme Court nullified Texas' requirement of one year's state and three months' county residence (*Dunn* v. *Blumstein* (1972) 405 U.S. 330 [31 L.Ed.2d 274, 92 S.Ct. 995]) and held that Georgia's fifty-day residence statute "approaches the outer constitutional limits in this area." (*Burns* v. *Fortson* (1973) 410 U.S. 686, 687 [35 L.Ed.2d 633, 635, 93 S.Ct. 1209].) Similarly, the California courts have rejected this state's demand for voter residence of 1 year in the state, 90 days in the county and 54 days in the precinct, holding that a voters' durational residence requirement of more than 30 days was impermissible. (*Young* v. *Gnoss* (1974) 7 Cal.3d 18, 27-28 [101 Cal.Rptr. 533, 496 P.2d 445]; *Keane* v. *Mihaly* (1970) 11 Cal.App.3d 1037 [90 Cal.Rptr. 263].)

A somewhat variant test of equal protection has been applied to reject state laws imposing heavy filing fees on election candidates. The filing fee cases are featured by a significant semantic shift. Although continuing adherence to the customary "strict scrutiny" rhetoric, the latter decisions no longer insist upon a "compelling governmental interest;" instead, they call upon the state to show that its restriction is "reasonably necessary" to achieve a legitimate public interest. (*Bullock* v. *Carter* (1972) 405 U.S. 134, 144 [31 L.Ed.2d 92, 100, 92 S.Ct. 849]; *Lubin* v. *Panish* (1974) 415 U.S. 709, 718 [39 L.Ed.2d 702, 709-710, 94 S.Ct. 1315]; *Knoll* v.

---

[3]Although the state Supreme Court's denial of a hearing after the decision of a Court of Appeal is not "without significance" as an indication of the former's views, it is likewise true that the authority of a case (here, *Gage* v. *Allison*) may be dissipated by later decisional trends, as well as by an express overruling. (*In re Lane* (1962) 58 Cal.2d 99, 105 [22 Cal.Rptr. 857, 372 P.2d 897].)

*Davidson* (1974) 12 Cal.3d 335, 345-347 [116 Cal.Rptr. 97, 525 P.2d 1273].)

Finally, in measuring candidate qualification laws against the equal protection guaranty, the federal Supreme Court has utilized a third verbal formula, one which bids "consider[ation of] the facts and circumstances behind the law, the interests which the State claims to be protecting, and the interest of those who are disadvantaged by the classification." (*Storer v. Brown* (1974) 415 U.S. 724, 730 [39 L.Ed.2d 714, 723-724, 94 S.Ct. 1274].)

## II

For present purposes, it is not vital to know whether the right to seek office is as "fundamental" as the right to vote. At the minimum, the former is an important and valued attribute of citizenship in an open society. "[L]egitimate State interest . . . must be achieved by a means that does not unfairly or unnecessarily burden . . . an individual candidate's . . . important interest in the continued availability of political opportunity. The interests involved are not merely those of parties or individual candidates; the voters can assert their preferences only through candidates or parties or both and it is this broad interest that must be weighed in the balance. The right of a party or an individual to a place on a ballot is entitled to protection and is intertwined with the rights of voters." (*Lubin* v. *Panish, supra,* 415 U.S. at p. 716 [39 L.Ed.2d at p. 708].)

█ It is unnecessary to decide here whether the relatively stringent "compelling interest" test or the relatively mild "reasonable necessity" test is appropriate. Even by the measure of the latter, the one-year durational residence requirement for local candidates fails. Its preference for settled inhabitants and its denial of political opportunity to new inhabitants is restrictive beyond its reasonable necessity for achieving legitimate public ends.

## III

In weighing the public ends served by election laws which prefer one class of citizens over another, the voter qualification cases (e.g., *Dunn* v. *Blumstein*) and the candidate qualification decisions (e.g., *Thompson* v. *Mellon*) place two separate factors on the scale: first, the requirement's value as a functional adjunct of the election machinery; second, its value in promoting intelligent participation in the election process. The

equal protection analysis suggested by *Storer* v. *Brown, supra,* 415 U.S. at page 730 [39 L.Ed.2d at page 724], invites consideration of a third factor, "the interests of those who are disadvantaged by the classification."

First, we consider the one-year residence test as an adjunct of the election machinery. The voter qualification cases say that 30 days' residence is enough to permit the machinery's orderly operation. (*Dunn* v. *Blumstein, supra,* 405 U.S. at p. 348 [31 L.Ed.2d at pp. 287-288]; *Young* v. *Gnoss, supra,* 7 Cal.3d at pp. 27-28.) One asks whether this time span is a relevant factor in the related problem of candidates' residence. At this point we turn to *Thompson* v. *Mellon, supra.* There, the leading opinion of Justice Sullivan suggests that the law may constitutionally require 30 days' residence preceding the filing of the candidate's nomination papers. (9 Cal.3d at p. 106.) The concurring opinion of Mosk, J., declares that residence on election day is enough. (9 Cal.3d at p. 109.) In all deference, we suggest the necessity for observing functional needs which demand treatment of candidate eligibility as a problem distinct from voter eligibility.

The prime objective of voter identification laws is to prevent voting by ineligibles and "repeaters." The main objective of candidate identification laws, in contrast, is attainment of an informed electorate. An orderly system of election laws crystallizes the issues and candidates during a given time-span before the election. During this period the election officials prepare and distribute sample ballots and print official ballots. During this period the candidates address their appeals to the voters. The latter, in turn, weigh the alternatives. They may rationally resolve their choices only by assurance that all the candidates are eligible. Ideally, an election is a knowledgeable choice among meaningful alternatives.[4] Fairly firm identification of candidates and issues for a given period before the election is indispensable to a knowledgeable choice.

Thus statutes and charters invariably fix an advance closing date for nominating petitions or declarations of candidacy.[5] The closed period

---

[4]The aphorism is not original. The writer first heard it from Dr. Peter Odegaard, then chairman of the political science department at the University of California, Berkeley.

[5]In nonchartered California counties, for example, candidates for county office must deliver their nomination papers to the county clerk at least 88 days before the primary election. (Elec. Code, § 6511; see, however, Elec. Code, § 6511.5.) Sample ballots must be prepared at least 25 days before the primary election and mailed to voters between 40 and 5 days before the election. (Elec. Code, § 10009.) In "general law" cities, nomination papers must be filed with the city clerk no later than noon on the 68th day before the election. (Elec. Code, § 22840.) Sample ballots must be

necessitated for ballot preparation and for the campaign creates a practical and legitimate need for candidates' compliance with eligibility criteria at the time they deposit their nominating papers. Justice Sullivan's dictum in *Thompson* v. *Mellon* (suggesting a 30-day candidate residence requirement to be met when the candidate files his papers) is consistent with the administrative necessities of the election process. Election mechanics create no need for an earlier date.

We consider the second factor: knowledge of community conditions and issues. This factor is most frequently advanced as justification for durational residence requirements. In *Dunn* v. *Blumstein, supra,* a voter qualification case, the court sharply challenged residence duration tests as a contribution to an informed electorate. It pointed out that the test allows long-time residents to vote regardless of knowledge or ignorance; that it bars many new residents who are minimally and often fully informed about the issues. A parallel observation occurs in the leading opinion in *Thompson* v. *Mellon, supra,* this time with reference to candidates: "The imprecise nature of a durational residence requirement which includes uninformed old time resident candidates but excludes well informed new resident candidates is clear. It is simply too crude and imprecise an instrument to effectuate this state interest [in knowledgeable candidates]." (9 Cal.3d at p. 105.)

A one-year waiting period distributes eligibility and ineligibility among the aware and unaware alike. It ignores the individual qualities of mind and character which make the difference between knowledge and ignorance, vigor and apathy. The settled inhabitant may gain awareness by osmosis; a newcomer with enough interest and zeal to become a candidate is likely to indulge in active and systematic study of the community. The settled inhabitant is immune from the "carpet-bagger" label; the newcomer must actively overcome it. A month may suffice for insight into a tiny community, five years fall short for thorough knowledge of a major metropolis.

Familiarity with community issues and problems need not await the lapse of time. In today's communities many local issues are not local at all; rather, they emerge as standard and recurring symptoms of American social history. Urban decay and suburban sprawl, racial and ethnic integration, law enforcement, education, public transit, the tax rate— these are some of the characteristic problems of American communities

prepared in time for mailing to municipal voters at least 10 days before the election. (Elec. Code, §§ 10012, 22832.)

generally. In any one voting enclave the characteristic issues are likely to outnumber the unique issues. Many newcomers arrive with ready-made sensitivity and awareness of these characteristic problems. Their imported ideas may be more efficacious than homegrown ideas. A one-year candidate residence requirement fails as a practical fulfillment of the public need for knowledgeable candidates.

We turn to the third factor: the interest of those disadvantaged by the classification. To the citizen interested in political opportunity in a new community, the one-year residence test imposes a penalty on mobility, a suspension of eligibility which may and often does last for much more than a year. The opinions in *Thompson* v. *Mellon* considered only the minimal impact of the waiting period, not its practical maxima. Indispensable to the constitutional inquiry is awareness that durational residence tests establish only a minimum; the actual suspension is more often three or five years than one year.

The actual extension of ineligibility beyond one year may be demonstrated with reference to the City of Chico. The city charter establishes a seven-member city council holding four-year staggered terms. Four members are elected at large in April of an odd-numbered year, three in April of the next odd-numbered year. (Chico City Charter, §§ 600, 404, 505.) As we have noted, the charter's one-year residence qualification is measured with reference to the filing date of nomination papers. (See fn. 1, *ante.*) Nomination papers must be filed at least 68 days before the election. (Chico City Charter, § 502; Elec. Code, § 22840.) Thus, January 1974 represents the approximate residence deadline for a candidate who wishes to qualify for the April 1975 election. A citizen who moved to Chico in February 1974 could not qualify as a candidate until the general municipal election of April 1977, more than three years after moving into the community.[6]

The disadvantage to the electorate is more diffuse. Voters may become disenchanted with chronic candidates and established officeholders; they

---

[6]We describe two further examples of the practical effect of the one-year residence test. A citizen gaining elector status in a county supervisorial district in July 1975 would be ineligible as a supervisorial candidate at the primary election in June 1976 and would wait four years more, until June 1980, for an opportunity to campaign for the board of supervisors in his district. (See Gov. Code, § 25041.) In practical terms, his suspension of eligibility would last almost five years, not one year.

Similarly, a citizen who becomes a resident of a "general law" city in May 1975 would be ineligible for election to the city council at the municipal election in April 1976 and would attain eligibility only with the election of April 1978, almost three years after his arrival in the community.

may desire fresh faces and fresh ideas. By barring a desirable candidate from the first election following his arrival, the residence test may postpone his candidacy for periods of three to five years, correspondingly narrowing the choices open to voters. The public disadvantage may be described in more fundamental terms. The courts have adopted the view that these waiting periods impose penalties upon the fundamental, constitutional "right to travel." (*Dunn* v. *Blumstein, supra,* 405 U.S. at pp. 338-342 [31 L.Ed.2d at pp. 281-284]; *Thompson* v. *Mellon, supra,* 9 Cal.3d at pp. 101-102; see also, *Ector* v. *City of Torrance* (1973) 10 Cal.3d 129, 135-136 [109 Cal.Rptr. 849, 514 P.2d 433].) Although clothed in constitutional terms, this view is essentially a manifestation of judicial sensitivity to the mobility which characterizes the nation's population in the waning decades \ of the 20th century. The injury may be expressed solely in equal protection terms, without the aid of the "right to travel" enlargement. Although the language of the Constitution (here, the equal protection clause) does not change, "the changing circumstances of a progressive society for which it was designed yield new and fuller import to its meaning." (*Sweezy* v. *New Hampshire* (1957) 354 U.S. 234, 266 [1 L.Ed.2d 1311, 1333, 77 S.Ct. 1203], concurring opn. of Frankfurter, J.; see also, *Euclid* v. *Ambler Realty Co.* (1926) 272 U.S. 365, 387 [71 L.Ed. 303, 310, 47 S.Ct. 114].) Citizen participation in the political process through voting and candidacy is the elemental, indispensable and abiding need of a democratic republic. Durational residence tests impose "dead periods" upon the exercise of political rights. They interrupt an abiding civic need. In a relatively rural society of relative population stability, these parochial restrictions dealt the body politic only a feeble loss. Today the republic is urbanized and industrialized, featured by the incessant relocation of citizens from one state or community to another. In this era of heightened mobility, repeated and widespread interruptions of political rights inflict exacerbated injury upon the body politic. The dead periods caused by durational residence laws affect more people frequently. The fluidity of our times sensitizes the equal protection guaranty into vigorous negation of restrictions which the quiet past might have tolerated.

As pointed out in Justice Burke's dissent in *Thompson* v. *Mellon* (9 Cal.3d at p. 111), county and city charters establish qualifications for office-holding under the "home rule" provisions of the state Constitution; as pointed out in Justice Mosk's concurring opinion (9 Cal.3d at p. 109), these charters are restricted by the "privileges or immunities" clause of the state Constitution. ■ Whatever the state constitutional status of the restrictive test in the Chico City Charter, it must measure up to the

Fourteenth Amendment's demand for equal protection of the laws. The one-year durational residence test for candidates is excessive to the needs of the election machinery; ineffectual as an assurance of knowledgeable candidates; imposes a public disadvantage by interrupting the exercise of the political franchise; is not "reasonably necessary" as a practical means of achieving a legitimate governmental interest. It contravenes the Fourteenth Amendment and cannot stand.

The issues raised by the petition for writ of mandate to compel issuance of nomination papers became moot after trial court's denial of relief. The judgment will therefore be affirmed. Petitioners will recover costs on appeal. (See *Zeilenga* v. *Nelson, supra,* 4 Cal.3d at p. 724.)

Richardson, P. J., and Janes, J., concurred.