[L.A. No. 30401. In Bank. Oct. 27, 1975.]

WAYNE CLARKE JOHNSON et al., Petitioners, v.
ELAINE HAMILTON, as City Clerk, etc., Respondent.

464

**COUNSEL**

Gottlieb, Gottlieb & Stein, Arthur J. Gottlieb and Karl Manheim for Petitioners.

Fred Okrand as Amicus Curiae on behalf of Petitioners.

Leonard Putnam, City Attorney, and Arthur Y. Honda, Deputy City Attorney, for Respondent.

**OPINION**

**RICHARDSON, J.**—This case invites our inquiry into an area that has been well illuminated by several recent opinions of this court. The issue presented is the constitutionality of two provisions of the Charter of the City of Long Beach which impose residence requirements upon candidates for city office. We have concluded that the provisions are invalid as violative of the equal protection clause of the Fourteenth Amendment.

Petitioner was a candidate for City Councilman of Long Beach at a primary nominating election held March 18, 1975, and, if successful, would have been a candidate at the general municipal election held on May 13, 1975. On December 9, 1974, the respondent City Clerk of Long Beach informed petitioner that petitioner failed to satisfy two provisions of the city charter, namely, (1) section 29, requiring a one-year residence in the city preceding the election or appointment to any board or commission of the city, and (2) section 30, requiring, as to a candidate for councilman, a six month's residence in the district from which he is nominated, prior to filing his declaration of candidacy. By January 22, 1975, the last day on which candidates could file for the office of councilman, petitioner would have been a district resident for five and one-half months, and by May 13, 1975, general municipal election day, he would have been a city resident for nine months. He thus failed to meet the requirements of either section 29 or 30.

Declarations of candidacy for the office in question were required to be filed between January 7 and January 22, 1975. In order to expedite adjudication of the controversy petitioner sought, and was denied, a writ of mandate in the Court of Appeal. On January 14, 1975, we issued an alternative writ of mandate directing respondent city clerk either to accept petitioner's nominating papers or to show cause why she had not done so. On January 22, 1975, respondent in her return to the alternative writ informed us that she had accepted petitioner's nominating papers and would place his name on the ballot if the papers were found to be in order.

We are informed that petitioner was defeated at the March 18 primary election, thereby raising the issue of mootness. Respondent, however, requested that we retain the case and decide the issue on the merits in view of the importance of the question presented and its effect upon future candidates and elections. We have frequently held that a case is not mooted from the fact alone that the issue in the case is of no further immediate interest to the person raising it. (*Gordon* v. *Justice Court* (1974) 12 Cal.3d 323, 326, fn. 1 [115 Cal.Rptr. 632, 525 P.2d 72]; *Zeilenga* v. *Nelson* (1971) 4 Cal.3d 716, 719-720 [94 Cal.Rptr. 602, 484 P.2d 578].) For example, in *In re William M.* (1970) 3 Cal.3d 16, 23 [89 Cal.Rptr. 33, 473 P.2d 737], we noted that: "[I]f a pending case poses an issue of broad public interest that is likely to recur, the court may exercise an inherent discretion to resolve that issue even though an event occurring during its pendency would normally render the matter moot."

Furthermore, petitioner in his second cause of action purports to represent a *class* of persons who are similarly barred from candidacy by reason of the subject charter provisions. Although the underlying controversy may be moot as to petitioner, others similarly situated may be affected and the issues as to them may not be moot. (See *Sosna* v. *Iowa* (1975) 419 U.S. 393, 397-398 [42 L.Ed.2d 532, 539-540, 95 S.Ct. 553] [class action attack on one-year residence requirement for obtaining divorce].)

Finally, the Courts of Appeal have reached conflicting results in regard to the validity of a one-year residence requirement for candidates (*Smith* v. *Evans* (1974) 42 Cal.App.3d 154 [116 Cal.Rptr. 684], and *Gage* v. *Allison* (1972) 22 Cal.App.3d 85 [99 Cal.Rptr. 95]), thereby necessitating resolution of this important issue.

Finding the issue ripe for review and for the foregoing reasons, we address the issue of durational residence requirements for political office.

Petitioner's constitutional challenge is broad. He argues that candidates disqualified from the ballot for their failure to meet the durational residence requirements are deprived of equal protection of the laws contrary to the Fourteenth Amendment, and that three important and fundamental rights are thereby necessarily impaired, namely, the rights to run for public office, to vote, and to travel. He urges that section 29 (the city) and section 30 (the district) of the charter impose conditions which "unfairly and indiscriminately exclude qualified and capable candidates" without any justification which is either reasonable or compelling.

In consideration of constitutional attacks of the kind herein presented courts have utilized a two-level test in applying equal protection standards. Ordinarily, a legislative classification will be upheld if it bears a "rational relationship to a legitimate state purpose." (*Weber* v. *City Council* (1973) 9 Cal.3d 950, 958-959 [109 Cal.Rptr. 553, 513 P.2d 601]; *Westbrook* v. *Mihaly* (1970) 2 Cal.3d 765, 784-785 [87 Cal.Rptr. 839, 471 P.2d 487], vacated on other grounds, 403 U.S. 915 [29 L.Ed.2d 692, 91 S.Ct. 2224].) In cases involving "suspect classifications" or touching upon "fundamental interests," however, courts have "adopted an attitude of active and critical analysis, subjecting the classification to strict scrutiny . . . . Under the strict standard applied in such cases, the state bears the burden of establishing not only that it has a *compelling* interest which justifies the law but that the distinctions drawn by the law are *necessary* to further its purpose." (*Westbrook* v. *Mihaly, supra,* at pp. 784-785; *Weber* v. *City Council, supra,* at p. 959; *Thompson* v. *Mellon* (1973) 9 Cal.3d 96, 99, fn. 2 [107 Cal.Rptr. 20, 507 P.2d 628, 65 A.L.R.3d 1029].)

Several recent federal Supreme Court decisions on the point suggest that candidacy for public office may not be a fundamental right protected by the Fourteenth Amendment, and that legislative restrictions upon it need not necessarily invoke strict scrutiny. (See *American Party of Texas* v. *White* (1974) 415 U.S. 767, 780, fn. 11 [39 L.Ed.2d 744, 760, 94 S.Ct. 1296]; *Storer* v. *Brown* (1974) 415 U.S. 724, 730 [39 L.Ed.2d 714, 723-724, 94 S.Ct. 1274]; *Lubin* v. *Panish* (1974) 415 U.S. 709, 719 [39 L.Ed.2d 702, 710, 94 S.Ct. 1315]; *Bullock* v. *Carter* (1972) 405 U.S. 134, 142-144 [31 L.Ed.2d 92, 99-100, 92 S.Ct. 849].) Thus, in *Bullock,* in which the high court applied equal protection standards to a Texas filing fee system, the court observed that it ". . . has not heretofore attached such fundamental status to candidacy as to invoke a rigorous standard of review" (*id.* at pp. 142-143 [31 L.Ed.2d at p. 99]), and that even the existence of barriers to candidate access to the ballot, which limit the

voter's choice of candidates, ". . . does not of itself compel close scrutiny." (*Id.* at p. 143 [31 L.Ed.2d at p. 100].) The *Bullock* court reasoned, however, that the Texas filing fee system ". . . falls with unequal weight on voters, as well as candidates, according to their economic status" (*id.* at p. 144 [31 L.Ed.2d at p. 100]), thus resulting in an appreciable *financial* impact upon the exercise of the franchise and thereby invoking the strict scrutiny test. (See *Harper* v. *Virginia Bd. of Elections* (1966) 383 U.S. 663 [16 L.Ed.2d 169, 86 S.Ct. 1079]; *Lubin* v. *Panish, supra,* 415 U.S. 709, involving California's filing fee system.)

Similarly, in *American Party* and *Storer,* strict scrutiny was employed to determine the validity of ballot restrictions upon independent candidates since these restrictions placed "unequal burdens on minority groups" thereby limiting their "First Amendment freedoms." (*American Party of Texas* v. *White, supra,* 415 U.S. 780, fn. 11 [39 L.Ed.2d at p. 760].) In the matter before us, unlike *American Party, Storer, Lubin* or *Bullock,* the durational residence requirement has no unequal impact upon poor or minority candidates or voters, but by its nature falls with equal force upon every candidate.

On the other hand, the United States Supreme Court has employed a strict scrutiny test in several recent cases invalidating residence requirements within somewhat different contexts: *Memorial Hospital* v. *Maricopa County* (1974) 415 U.S. 250 [39 L.Ed.2d 306, 94 S.Ct. 1076] (one-year county residence requirement for the receipt of indigent medical care); *Dunn* v. *Blumstein* (1972) 405 U.S. 330 [31 L.Ed.2d 274, 92 S.Ct. 995] (one-year state and 90-day county residence requirement for voters); and *Shapiro* v. *Thompson* (1969) 394 U.S. 618 [22 L.Ed.2d 600, 89 S.Ct. 1322] (one-year residence requirement for receiving welfare benefits). In its most recent decision, however, the majority of the high court appear to have adopted a "reasonable justification" test despite Justice Marshall's insistence in dissent that since the "constitutional" right to travel was affected, a "compelling governmental interest" approach was required. (*Sosna* v. *Iowa, supra,* 419 U.S. 393 [upholding a one-year state residence requirement for filing for divorce].)

Other recent decisions of the United States Supreme Court disclose considerable difference of opinion with respect to the appropriate test to be used in measuring the validity of statutes challenged on equal protection grounds. (Compare the majority and dissenting opinions in *Schlesinger* v. *Ballard* (1975) 419 U.S. 498 [42 L.Ed.2d 610, 95 S.Ct. 572] *Geduldig* v. *Aiello* (1974) 417 U.S. 484 [41 L.Ed.2d 256, 94 S.Ct. 2485];

*Marshall* v. *United States* (1974) 414 U.S. 618 [38 L.Ed.2d 618, 94 S.Ct. 700]; *Kahn* v. *Shevin* (1974) 416 U.S. 351 [40 L.Ed.2d 189, 94 S.Ct. 1734]; *Storer* v. *Brown, supra,* 415 U.S. 724; *Lubin* v. *Panish, supra,* 415 U.S. 709; *San Antonio School District* v. *Rodriguez* (1973) 411 U.S. 1 [36 L.Ed.2d 16, 93 S.Ct. 1278].) The foregoing opinions have caused one commentator to conclude that the high court's formulations in the equal protection area are presently in flux. (Gunther, *The Supreme Court, 1971 Term—Foreword: In Search of Evolving Doctrine on a Changing Court: A Model for a Newer Equal Protection* (1972) 86 Harv.L.Rev. 1, 10-15; see also Note, *The Supreme Court of California 1972-1973* (1974) 62 Cal.L.Rev. 309, 462-464; Note, *A Question of Balance: Statutory Classifications Under the Equal Protection Clause* (1973) 26 Stan.L.Rev. 155.)

We have recently had occasion, in a series of cases, to hold invalid candidate residence requirements on equal protection grounds. Thus, in *Zeilenga* v. *Nelson, supra,* 4 Cal.3d 716, we found deficient a five-year durational residence requirement imposed by the Butte County Charter on candidates for the county board of supervisors. At the same time, in *Camara* v. *Mellon* (1971) 4 Cal.3d 714 [94 Cal.Rptr. 601, 484 P.2d 577], we invalidated a three-year residence requirement of the Santa Cruz City Charter for candidates to the city council. Most recently, in *Thompson* v. *Mellon, supra,* 9 Cal.3d 96, we found vulnerable to similar attack a two-year requirement contained in the same charter, and for the same office as those involved in *Camara.*

In *Zeilenga,* we described the right to hold public office as valuable, fundamental and one that is subject to First Amendment protection, the impairment of which can be justified only by a "compelling governmental interest." We emphasized as well the interlocking relationships between the right to vote and the right to hold office. (See also *Thompson* v. *Mellon, supra,* 9 Cal.3d at pp. 99-102 [opn. by Sullivan, J.], emphasizing the effect of candidate restrictions upon the rights to vote and to travel.)

From the foregoing and by reason of the fact that durational residence requirements for candidates for public office impinge not only on one but on three important rights to which we have previously adverted, namely, candidacy, voting and travel, we conclude that they necessarily invite application of the strict scrutiny test.

In applying this test we note preliminarily that it is difficult to conceive of principles more central to a political democracy than the free and

untrammelled access of the public to the ballot box and the reciprocal right of candidates to seek the public's suffrage. It follows, accordingly, that we examine with a close and questioning attention every intrusion, subtle or direct, which impairs or affects the unconditional exercise of these prerogatives.

■ Our inquiry is first directed to the discovery of those state interests of a compelling nature which warrant the restrictions. Two reasons are uniformly given for residence requirements, each pertaining to education—first, of the candidate regarding the issues, and second, of the electorate regarding the candidate. More specifically, advocates of the restrictions urge that a somewhat extended period of residence is reasonably required in order for a candidate to familiarize himself or herself with local conditions and problems to the degree that will assure effective representation. It is contended that those who for an appreciable interval become immersed in the local community are more likely to be knowledgeable and therefore more effective instruments of the societal will. Additionally, the argument runs that the public, on its part, requires a similar period of exposure of a candidate so that his or her character, ability, personality, and habits may become generally known and assessed. It is asserted that by a more prolonged contact the true strengths and weaknesses of the candidates may be measured and weighed. (See *Thompson* v. *Mellon, supra,* 9 Cal.3d at pp. 111-112 [dissenting opn. by Burke, J.].) In *Thompson,* following the rationale of *Dunn* v. *Blumstein, supra,* 405 U.S. at pp. 357-360 [31 L.Ed.2d at pp. 292-295], we considered in some depth and rejected these "educational" purposes, insofar as they supported the two-year durational requirement at issue therein, finding them, among other things, too "crude and imprecise." In doing so and by concluding that the rights to vote and hold office are interrelated, we also rejected our contrary expression of 42 years ago in which by a closely divided court we described the two rights as "independent matters." (*Lindsey* v. *Dominguez* (1933) 217 Cal. 533, 535 [20 P.2d 327].)

As we have noted, two appellate courts have arrived at conflicting results following analyses of the problem. In *Smith* v. *Evans, supra,* 42 Cal.App.3d 154, the court's careful analysis identified and focused on three predominant interests involved in the durational residency disputes, namely, the official public interest in the mechanics of the election process, the candidate's knowledge of the prevailing issues in a community, and the "interest of those disadvantaged by the classification," including the potential candidates and the public. The court properly

noted that both public and candidates suffer a loss of political rights from the imposition of "dead periods" by reason of durational residence requirements. (*Id.* at pp. 161-162.)

In *Gage* v. *Allison, supra,* the court upheld the one-year residency requirement for candidates for Los Angeles County Supervisor relying on *Lindsey.*

While *Dunn* v. *Blumstein, supra,* as noted by Justice Burke in his dissent in *Thompson,* involved voter not candidate residence, the close interlocking conceptual and functional relationship between voter and candidate recognized in *Thompson* makes particularly relevant the following conclusion of the United States Supreme Court in *Dunn:* "[A]s devices to limit the franchise to knowledgeable residents, the conclusive presumptions of durational residence requirements are much too crude. They exclude too many people who should not, and need not, be excluded. They represent a requirement of knowledge unfairly imposed on only some citizens. . . . Here, there is simply too attenuated a relationship between the state interest in an informed electorate and the fixed requirement that voters must have been residents in the State for a year and the county for three months. *Given the exacting standard of precision we require of statutes affecting constitutional rights, we cannot say that durational residence requirements are necessary to further a compelling state interest.*" (Italics added.) (405 U.S. at p. 360 [31 L.Ed.2d at p. 294].) No persuasive reason has been suggested why the foregoing *Dunn* analysis is not applicable with equal force to similar requirements imposed on candidates for public office.

In terms of the education of the candidate, the argument that an extended residence is necessary for an understanding of local issues, while perhaps appealing in the abstract, nonetheless ignores the hard realities bearing on the relationship of candidate and issue. The knowledge, appreciation, and comprehension of the public issues and problems which a candidate either possesses or may reasonably be expected to acquire are so much the product of the variables of motivation, intelligence, maturity, experience, opportunity, and desire as to make any flat rule of physical residence appear immediately suspect and arbitrary. The congeries of individual capacities for observation, study, exposure, and growth are simply so different as to be inhospitable to a rigid fixed qualification tied to residence.

Similarly, the public's need for education and information about a candidate are not served by a proscription so imperious as one based

upon extended physical presence alone. The advent of mass media in all their forms, the electronic transmission both pictorially and by the spoken word, together with the easy mobility of persons and image, and the increasing use of forums, debates, and voter education programs in combination reduce and dilute the expectancy that voter evaluation and education can best be served by an arbitrary residence requirement of the candidate.

One disturbing phenomenon of the current political scene of which we may take judicial notice is an apparent substantial increase in voter apathy. The erosion and decay caused by the acid of indifference, unconcern, and lack of participation, if prolonged, may pose a danger to the democratic institutions, far more subtle and invidious than any other. Such a danger suggests the wisdom of widening rather than narrowing the candidate options available to the public. The vigor of a democracy depends upon the continued infusion into the stream of public debate of the views and proposals of the many. These views and the political fortunes of those who as candidates for public office advance them will be accepted or rejected by the people whose common sense and good judgment may, indeed must, be trusted. For in the final analysis it is the people's business with which we are concerned.

Our attention has been called to two recent cases in which the United States Supreme Court has, by summary affirmance, declined invitations to strike down rather lengthy durational residence requirements imposed upon candidates for *state* office. In *Kanapaux* v. *Ellisor* (D.S.C. 1974) affirmed (1974) 419 U.S. 891 [42 L.Ed.2d 136, 95 S.Ct. 169], the federal district court upheld South Carolina's five-year residence requirement for candidates for *governor.* And in *Sununu* v. *Stark* (D.N.H. 1974) 383 F.Supp. 1287, affirmed (1975) 420 U.S. 958 [43 L.Ed.2d 435, 95 S.Ct. 1346], the federal district court upheld New Hampshire's seven-year residence requirement for candidates for *state senator.*

■ Summary affirmance by the Supreme Court is not necessarily dispositive of the court's position with respect to the constitutional issues raised in the case (see *Serrano* v. *Priest* (1971) 5 Cal.3d 584, 615-617 [96 Cal.Rptr. 601, 487 P.2d 1241, 41 A.L.R.3d 1187]). We are cognizant that, as illustrated by *Kanapaux* and *Sununu,* there exist numerous provisions in state and federal Constitutions imposing durational residence requirements for a series of state and federal executive and legislative officials from the President of the United States to members of the state

Legislature. (See *Thompson* v. *Mellon, supra,* 9 Cal.3d at p. 113 [dissenting opn. by Burke, J.].) The validity of such requirements, however, is not presently before us.

■ In summary we scrutinize strictly the residence requirements of the Long Beach Charter impinging as they do on the three fundamental interests to which we have referred. Such inquiry .discloses no state interest of a compelling nature which justifies the restrictions in question.

There do exist, however, "compelling" reasons for a requirement that candidates for public office establish their residence, and eligibility for office, within a reasonable and fixed time prior to the election. As explained in *Smith* v. *Evans, supra,* 42 Cal.App.3d 154, "An orderly system of election laws crystallizes the issues and candidates during a given time-span before the election. During this period the election officials prepare and distribute sample ballots and print official ballots. During this period the candidates address their appeals to the voters. The latter, in turn, weigh the alternatives. They may rationally resolve their choices only by assurance that all the candidates are eligible." (*Id.* at p. 160.)

Accordingly, it has been suggested that a public entity may constitutionally require a prospective candidate to be "a resident at the time he files his nominating papers or equivalent declaration of candidacy and for a period of not more than 30 days next preceding such date of filing." (*Thompson* v. *Mellon, supra,* 9 Cal.3d at p. 106 [opn. of Sullivan J.]; accord *Smith* v. *Evans, supra,* 42 Cal.App.3d at pp. 160-161; cf. *Dunn* v. *Blumstein, supra,* 405 U.S. at p. 348 [31 L.Ed.2d at pp. 287-288]; but see *Thompson, supra,* 9 Cal.3d at pp. 109-110 [opn. by Mosk, J.].)

Such a 30-day prefiling residence requirement seems reasonably necessary and convenient to accommodate the needs of election officials in their task of timely verification of the candidate's true residence prior to the preparation and distribution of ballots. Accordingly, we hold that any durational residence requirement for candidates for local office in excess of the foregoing period is violative of the equal protection clause of the Fourteenth Amendment. To the extent that it is inconsistent with this opinion, *Gage* v. *Allison, supra,* 22 Cal.App.3d 85, is disapproved.

Since respondent city clerk accepted petitioner's nominating papers and agreed to consider petitioner as a candidate for the subject election

the alternative writ of mandate is discharged and the peremptory writ is denied.

Wright, C. J., Tobriner, J., and Sullivan, J., concurred.

**CLARK, J.**—Although United States Supreme Court pronouncements compel concurrence, I do so with apprehension. Today's holding invites mischief to local elections, for it is now possible for a candidate with little genuine interest in a locality to inject himself into its politics. While the voters ordinarily would be expected to reject such a person, the good judgment necessary to do so is more difficult to exercise when the candidate's only exposure to the electorate has been his behavior during the course of a brief campaign. (See *Thompson* v. *Mellon* (1973) 9 Cal.3d 96, 111-112 [107 Cal.Rptr. 20, 507 P.2d 628, 65 A.L.R.3d 1029] (Burke, J., dissenting).)

The difficulty of ferreting out spurious candidates is compounded by the Supreme Court's decision in *Dunn* v. *Blumstein* (1972) 405 U.S. 330 [31 L.Ed.2d 274, 92 S.Ct. 995], wherein a durational residency requirement for voters was struck down. That decision, in combination with today's, creates the danger of roving candidates picking their elections and bringing their voters with them.

The danger of this electoral tandem, while perhaps negligible in large urban populations, is substantial in rural areas with smaller voter bases. Given enough imported voters, outvoting an existing majority of bona fide residents is possible—inviting a new form of gerrymandering. And, because apparent residence is easy to acquire but intent to remain is difficult to verify, the local entity will be hardpressed to protect itself.

I question the wisdom of striking at a city's legitimate interests in protecting its electoral process at a time when voter discontent and indifference appear high. Allowing spurious candidates and transient voters the opportunity to determine local elections may further weaken the trust essential to our democratic system.

We are not so far from Reconstruction that animosity does not still linger. We long paid the price for having imposed the carpetbaggers of

that era on an unwilling populace. Today's decision may present new costs.

McComb, J., concurred.

**MOSK, J.**—I concur.

Nevertheless, I still adhere to the belief that the preferable test is to determine whether the elected candidate meets residence requirements at the time of assumption of office. (See my concurring opinion in *Thompson* v. *Mellon* (1973) 9 Cal.3d 96, 109 [107 Cal.Rptr. 20, 507 P.2d 628, 65 A.L.R.3d 1029].) I would also base our conclusion on article I, section 7, subdivision (b), of the California Constitution.

However, recognizing that in this field as in so many others, perfection eludes definition as well as attainment, I am willing to join the majority in its conclusion.