[Civ. No. 13659. Fourth Dist., Div. Two. Jan. 28, 1975.]

LOUIS DE BOTTARI et al., Plaintiffs and Appellants, v.
SIMON MELENDEZ, as City Clerk, etc., Defendant and Respondent.

**COUNSEL**

Fred Okrand, John D. O'Loughlin, Jill Jakes, Daniel C. Lavery and Mark Rosenbaum for Plaintiffs and Appellants.

Timlin & Coffin and Robert J. Timlin for Defendant and Respondent.

**OPINION**

**TAMURA, Acting P. J.**—This appeal involves the constitutionality of Elections Code section 27521 insofar as it disqualifies a recalled city officer of a general law city from being a candidate for such office for a period of one year after his recall. The issue is one of first impression in California.[1]

Three recalled city councilmen of the City of Norco (city), a general law city, appeal from an order denying their petition for a writ of mandate to compel the city clerk to place their names on the ballot for a general city election to be held within a year after their recall. On August 21, 1973, an election was held in the city which resulted in the recall of petitioners. To fill their positions a special election was called for November 13, 1973. Petitioners attempted to file nomination papers for that election but the city clerk refused to accept them on the ground Elections Code section 27521[2] disqualified petitioners from seeking councilmanic office for one year following their recall. On November 1, 1973, petitioners sought a writ of mandate in superior court to compel

[1]Cases in other jurisdictions upholding limitations on successive terms in office (*Maddox* v. *Fortson*, 226 Ga. 71 [172 S.E.2d 595] [cert. den., 397 U.S. 149 (25 L.Ed.2d 183, 90 S.Ct. 999)]; *Benzow* v. *Cooley*, 12 App.Div.2d 162 [209 N.Y.S.2d 364, 367]) involve similar restrictions but are not authoritative here since such limitations serve totally different governmental interests.

[2]All subsequent citations to statutes will be to the Elections Code. Section 27521 provides:
"A person who has been recalled, or who has resigned from office while recall proceedings were pending against him, shall not be a candidate for nor appointed to such office within one year after his resignation or recall."

the city to accept their nomination papers and cause their names to appear on the ballot for the special election. The writ was denied; the special election was held; and, on November 20, 1973, petitioners were replaced by newly elected councilmen.

In December 1973, petitioners attempted to file nomination papers to regain their offices at the next general municipal election to be held March 5, 1974. The city clerk again refused to accept the papers on the basis of section 27521. Petitioners thereupon returned to the superior court again seeking a writ of mandate on the ground that section 27521 was unconstitutional on its face. An alternative writ issued and the city responded by answer and general demurrer. Following argument and submission, the court denied the petition and discharged the alternative writ.

In January 1974, petitioners filed a petition for writ of mandate, substantially similar to those previously filed in the superior court, in the California Supreme Court. The Supreme Court summarily denied the petition without opinion.[3]

This is an appeal from the order of the superior court denying the second petition for writ of mandate.

 Preliminarily, it should be noted that since the election is long past there is no relief which this court can give petitioners. However, the constitutional question presented by this appeal being of statewide concern and being one which, due to inherent time limitations, eludes timely review, a discussion of the merits is appropriate for the guidance of city governments and lower courts. (*Knoll* v. *Davidson*, 12 Cal.3d 335, 344 [116 Cal.Rptr. 97, 525 P.2d 1273]; *Zeilenga* v. *Nelson*, 4 Cal.3d 716, 719-720 [94 Cal.Rptr. 602, 484 P.2d 578].)

 Directing our attention to the merits, petitioners contend that section 27521 violates the equal protection clause of the Fourteenth Amendment to the federal Constitution and the similar guarantees of article I, sections 11 and 21, of the California Constitution. They argue that the right to be a candidate for public office is a fundamental right and therefore any classification which restricts the exercise of this right

---

[3]Justices Tobriner and Mosk voted to grant the petition. A summary denial of a petition for a writ of mandate is not a precedent, nor law of the case, nor res judicata except when the sole possible ground of denial was on the merits. (*People* v. *Medina*, 6 Cal.3d 484, 490-492 [99 Cal.Rptr. 630, 492 P.2d 686].)

by a certain group of citizens must be subjected to strict scrutiny. On this premise, they urge that the classification made by section 27521—singling out municipal officials defeated in a recall election and disqualifying them from candidacy for one year—is not necessary to further a compelling governmental interest and is therefore unconstitutional. Based upon the ensuing analysis, we have concluded that petitioners' contention must be upheld.

I

■ Section 27521 affects fundamental civil rights and therefore must be subjected to strict scrutiny.

The United States Supreme Court recently declined to decide whether the right of candidacy, standing alone, is a fundamental right. (*Bullock* v. *Carter*, 405 U.S. 134, 142-143 [31 L.Ed.2d 92, 99-100, 92 S.Ct. 849].) Nevertheless in *Bullock* as well as other recent federal cases dealing with laws restricting the right of candidacy, such as by minimum residency requirements or filing fees, a strict scrutiny test has been regularly applied by finding an impact on other rights which are considered fundamental under the federal Constitution, such as on the right to vote (e.g., *Bullock* v. *Carter, supra,* 405 U.S. 134, 144 [31 L.Ed.2d 92, 100]; *Lubin* v. *Panish,* 415 U.S. 709, 715-718 [39 L.Ed.2d 702, 708-709, 94 S.Ct. 1315]; *Communist Party of Indiana* v. *Whitcomb,* 414 U.S. 441, 449-450 [38 L.Ed.2d 635, 643, 94 S.Ct. 656]) or the right of travel (e.g., *Wellford* v. *Battaglia,* 343 F.Supp. 143, 147-148).

Although the California Supreme Court at one time labeled the right of candidacy fundamental (*Zeilenga* v. *Nelson, supra,* 4 Cal.3d 716, 720-721), in its post-*Bullock* cases our high court has, without abandoning its earlier declaration concerning the fundamental nature of the right to be a candidate for public office, adopted the posture of the federal courts in determining whether the classification should be closely scrutinized by studying the impact on other related rights.[4] (*Knoll* v. *Davidson, supra,* 12 Cal.3d 335; *Thompson* v. *Mellon,* 9 Cal.3d 96 [107

---

[4]The city argues that holding section 27521 unconstitutional would seriously infringe upon the federally guaranteed voting rights of those favoring recall and therefore to base such a holding on the right of candidacy as fundamental under the California Constitution only would raise an issue under the supremacy clause of the United States Constitution. Our treatment of the case makes it unnecessary to address this complex argument.

Whether the right of candidacy is fundamental under the California Constitution is apparently an unsettled question. (*Smith* v. *Evans,* 42 Cal.App.3d 154, 159 [116 Cal.Rptr. 684].)

Cal.Rptr. 20, 507 P.2d 628].) Our attention has not been called to a single recent case, state or federal, where restrictions on ·candidacy have escaped close scrutiny.

Were the question presented in pure form we would have no difficulty in finding the right of candidacy fundamental for a democracy should be ever vigilant to see that all citizens and especially minority group members have a fair and equal opportunity to seek and win public office. However, it is not necessary to rest our decision on this ground alone since the right to vote is also substantially affected by section 27521.[5] Statutes significantly restricting the right to vote are especially deserving of strict scrutiny since the franchise is among the most fundamental of rights. "No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined." (*Wesberry* v. *Sanders,* 376 U.S. 1, 17 [11 L.Ed.2d 481, 492, 84 S.Ct. 526].)

There is an inextricable relationship between the right to vote and restrictions on candidacy. "Unless a person can find on the ballot a candidate who reflects to some extent his policy preferences, it cannot be said that he is voting effectively. Although this does not mean that every voter must find a candidate to his liking on the ballot, it certainly requires that every voter have an equal opportunity to place a candidate of his choice on the· ballot." (Note, *The Constitutionality of Candidate Filing Fees,* 70 Mich.L.Rev. 558, 576; see also: *Lubin* v. *Panish, supra,* 415 U.S. 709, 716-718 [39 L.Ed.2d 702, 709].)

It would be wholly inadequate to say that supporters of a recalled official could find another candidate to champion their point of view, for a candidate is more than his political platform. Temperament, native skill, and experience make some persons more effective in office than others, and more attractive to voters. In a small community the pool of qualified candidates willing and able to support a particular point of view is likely to be small. That petitioners were once elected city councilmen testifies to their standing and popularity in the community. It must be noted that a recall proceeding may be instituted for reasons wholly apart from the competence or integrity of the officer. In the case at bench, it appears that petitioners were recalled, not for incompetence or corruption, but for their stand on public issues affecting the city. A law

---

[5]Petitioners alleged that they were registered voters and thus have standing to argue infringement of the right to vote.

which bars established community figures from seeking municipal office significantly restricts the choice of voters. The impact of the law in question on the right to vote is therefore real and appreciable. (See *Bullock* v. *Carter, supra,* 405 U.S. 134, 144.)

Moreover, although the statute does not classify according to a recognized suspect criterion, there is a danger that its impact will be felt most strongly by minority racial, ethnic, and political groups, since officials who are strong advocates of minority group interests may be especially vulnerable to recall. (See *Williams* v. *Rhodes,* 393 U.S. 23, 31 [21 L.Ed.2d 24, 31, 89 S.Ct. 5].) Although the statute in question does not prevent anyone from casting a ballot, it effectively disfranchises supporters of the recalled official if, as seems likely, a completely acceptable alternative candidate is not available. Strict scrutiny is therefore appropriate.

Strict scrutiny in equal protection cases has been held to mean the court must satisfy itself that the law in question is necessary to promote some compelling governmental interest. (*Thompson* v. *Mellon, supra,* 9 Cal.3d 96, 102; *Zeilenga* v. *Nelson, supra,* 4 Cal.3d 716, 723; *Westbrook* v. *Mihaly,* 2 Cal.3d 765, 785 [87 Cal.Rptr. 839, 471 P.2d 487] [cert. den., 403 U.S. 922 (29 L.Ed.2d 700, 91 S.Ct. 2225)].) However, recent opinions by the United States Supreme Court suggest that an especially even-handed approach should be used in applying the strict scrutiny test to determine the validity of statutory qualifications for elective public office. In *Storer* v. *Brown,* 415 U.S. 724, 730 [39 L.Ed.2d 714, 723-724, 94 S.Ct. 1274], the court said: "[T]he States have evolved comprehensive and in many respects complex election codes regulating in most substantial ways . . . the selection and qualification of candidates. [¶] It is very unlikely that all or even a large portion of the state election laws would fail to pass muster under our cases; and the rule fashioned by the Court to pass on constitutional challenges to specific provisions of election laws provides no litmus-paper test for separating those restrictions that are valid from those that are invidious under the Equal Protection Clause. The rule is not self-executing and is no substitute for the hard judgments that must be made. Decision in this context, as in others, is very much a 'matter of degree,' *Dunn* v. *Blumstein, supra,* at 348, very much a matter of 'consider[ing] the facts and circumstances behind the law, the interests which the State claims to be protecting, and the interests of those who are disadvantaged by the classification.' *Williams* v. *Rhodes, supra,* at 30; *Dunn* v. *Blumstein, supra,* at 335. What the result of this process will be in any specific case may be very difficult to predict with great assurance."

Cautionary statements such as the above appearing in recent United States Supreme Court candidate-qualification cases have led some courts (*Smith* v. *Evans, supra,* 42 Cal.App.3d 154, 158-159) and commentators (Baker, *A Constitutional Remedy for the High Cost of Broadcast and Newspaper Advertising in Political Campaigns,* 60 Cal.L.Rev. 1371, 1380) to conclude that the High Court, while adhering to the "strict scrutiny" rhetoric, may have evolved a new test specifically for such cases.[6] In the absence of explicit language to the contrary, we prefer to assume that there is only one "strict scrutiny" test and that the high court merely intends that the test be applied with the special care appropriate to an area involving competition between vitally important interests. A certain amount of caution in reviewing laws setting qualifications for public office is understandable, since it is difficult to imagine an interest stronger than the public interest in having the powers of government administered by the most capable hands and restrictions on candidacy have been one of the traditional means to achieve this end. We have no doubt, for example, that it is constitutionally permissible to impose higher qualification standards on candidates than on voters. This means that such standards would stand up under strict scrutiny, not that strict scrutiny should be excused.

In any event, application of the supposed new test would not alter our view of the proper result in this case.

## II

Before considering whether section 27521 withstands the "strict scrutiny" test, it may be useful to summarize the recall provisions for municipal officials of general law cities with particular attention to the time periods involved.

The recall process begins with the filing of a notice of intention to circulate a recall petition and service of the same on the official to be recalled. (§ 27500.) The notice of intention may not be filed within the first six months of the official's term, nor within six months following the filing of prior recall petitions. (§ 27500.) The notice must contain the official's name, names of proponents of recall, and a statement of reasons for the recall. (§ 27504.)

---

[6]A frequently quoted formulation is the statement that such laws must be "reasonably necessary to the accomplishment of legitimate state objectives in order to pass constitutional muster." (*Bullock* v. *Carter, supra,* 405 U.S. 134, 144 [31 L.Ed.2d 92, 100].)

After the notice of intention is filed, the official has seven days to submit an answer following which the notice of intention and answer, if any, are published. (§ 27505.) Seven days after publication the recall petitions may be circulated and signed. Petitions signed by 25 percent of the electorate must be filed within 60 days of filing the notice of intention. (§ 27507.) After filing, the city clerk has 30 days to verify the petitions. (§ 27510.2.)

The recall ballot presents the question whether the official shall be recalled and, in addition, the proposition whether, if the recall should prevail, the vacancy shall be filled by appointment or special election. (§§ 27515, 27516.) Votes are canvassed on the first Tuesday after the election and, if a majority have voted for recall, the office is deemed vacant as of that date. (§ 27517.) But if, as in the case at bench, a majority of the city council is recalled, the recalled officials remain in office until a special election is held and their successors qualified. (§ 27519.) Such special election must be called by the city clerk immediately after the votes at the recall election are canvassed and must be held within 89 days thereafter. (§ 27519.)

Although section 27521 specifies a disqualification period of one year, in practice a recalled city official may be unable to run again for over two years. As in the case at bench, section 27521 frequently disqualifies the recalled official not only from the special election to fill the vacancy created by the recall, but also from the next general municipal election. Unless there is a premature vacancy, the official then must wait another two years for the following general election to run for his former office. In assessing the impact of the disqualification provision on the election process, this maximum duration should be kept in mind.

■ According to the city, the statute in question is necessary to further three governmental interests. The city contends that section 27521: (1) Prevents persons lacking substantial support from appearing on the ballot; (2) assures that election winners are the choice of the majority of voters; and (3) promotes stability in city government. These interests will be examined in turn.

■ There is a compelling governmental interest in preventing election ballots from being so cluttered with frivolous candidates as to confuse the electorate. (*Lubin* v. *Panish, supra,* 415 U.S. 709, 715-716 [39 L.Ed.2d 702, 708].) However, the one-year disqualification period established by section 27521 is not an appropriate means to assure that

candidates have substantial support. There are other "obvious and well known means of testing the 'seriousness' of a candidacy" (*Lubin* v. *Panish, supra,* 415 U.S. 709, 718 [39 L.Ed.2d 702, 710]; *Knoll* v. *Davidson, supra,* 12 Cal.3d 335, 348), primarily by requiring nominating petitions. The nomination provisions of the Elections Code are applicable to recalled officials as well as to other candidates and there is no reason to believe that recalled officials present a special problem requiring special treatment.[7] Indeed, as previously mentioned, an inference that the recalled official has sufficient support not to be a frivolous candidate may be drawn from the fact that he prevailed at the previous general election. Further, a hard-fought recall election is apt to fix the identity of the recalled official so firmly in the minds of the electorate that the familiar name on the ballot is particularly unlikely to cause voter confusion.

■ The real danger which alarms the city, and which it argues section 27521 was designed to meet, is that the recalled official will have too much popular support rather than too little. In other words, the recalled official might be elected even though a majority of the electorate find him unacceptable.

Ordinarily, of course, an official who has been removed by recall will stand little chance of winning an election held a few months later and for that reason would not seek reelection. Thus where the official's popularity has been substantially weakened by his recall, section 27521 is unnecessary to further this particular interest. However, given different levels of voter turnout and a close recall vote, an official might be able to regain his position, perhaps by a bare majority or a mere plurality, within a year of his recall. The city complains that this would "violate the integrity" of the recall vote and that section 27521 is an appropriate means to prevent it. This argument lacks substance.

The concept of the integrity of the recall vote is somewhat mystifying. The recall process is itself an example of the strong public policy in favor of affording voters opportunity for reassessing their choices of elected officials and a later expression of the public will is generally entitled to more weight than an earlier one.[8] Moreover, in the municipal recall election there is no standard of comparison, the only questions being

---

[7]Nomination papers for candidates must be signed by not less than 20 nor more than 30 voters in a city of 1,000 persons or more, and not less than 5 nor more than 10 voters in a city of less than 1,000 persons. (§ 22836.)

[8]As a rule, voter turnout at special elections is lighter than at general elections. Although we have not been furnished with empirical data on recall elections, nor are we

whether the official should be recalled and whether the vacancy resulting from a successful recall should be filled by appointment or by special election. It could be that at the special election following a recall election the other candidates would be so unattractive that the recalled official would seem the best of the lot. Thus it is conceivable that some of the voters who favored recall could vote for the recalled official in the subsequent election were he permitted to be a candidate. If so, why should these voters be denied the option? The success of a recall does not prove that the recalled official could not command majority support some months later. Voters could change their minds for any of a number of reasons, or voters who did not vote in the recall could turn out in the subsequent election. Nor would elimination of recalled officials guarantee that each election winner has majority support for the possibility of a plurality victory is inherent in our system of municipal elections. If plurality votes following recall elections present a substantial danger, then a statute may be tailored to meet this problem in a manner which does not single out the recalled candidate or severely limit voter choice, such as by providing for a run-off election.

■ The most substantial argument in favor of section 27521 is that it promotes stability in city government in two ways. First, the divisive issues involved in the recall campaign need not be debated again in a subsequent election if the only spokesman for one side, the recalled official, is not allowed to run. Second, the possibility of a second recall campaign within a short period after the first is reduced. This second proposition assumes that recall, unlike lightning, is more likely to strike the same person twice or, in other words, an official who is recalled but manages to win a subsequent election will be an especially likely target for recall and the second recall, even more than the first, would engender bitterness in the community, impair the smooth functioning of city government, and drain the energies of the challenged official.

The state has a legitimate interest in the stability of municipal government. (See *Storer* v. *Brown, supra,* 415 U.S. 724, 736 [39 L.Ed.2d 714, 727].) But this interest may not be promoted by measures directly aimed at curbing debate on issues of public importance however divisive they may be. (See *Terminiello* v. *Chicago,* 337 U.S. 1, 4 [93 L.Ed. 1131, 1134, 69 S.Ct. 894].) On the other hand, while we agree that this interest

---

aware of any, it seems reasonable that this rule would also apply to recall elections. If so, this would be another reason for preferring the results of a general election held within a year following a recall.

may be furthered by preventing too frequent recalls, section 27521 is not a necessary or appropriate means to this end.

Viewing the legislative scheme for recall as a whole, the one-year period appears to be excessive since other provisions, equally important to safeguarding the stability of local government, involve much shorter periods. If a challenged official wins a recall election, his opponents can start a new recall in only six months.[9] Should the official be recalled, on the other hand, his supporters can seek to recall his replacement subject only to the six months' waiting requirement of section 27500. It would seem, then, that the Legislature has decided that six-month intervals between recall campaigns are tolerable and do not threaten the stability of local government.

Moreover, the disproportionately long period provided by section 27521 may actually encourage recalls. If an official is recalled by a narrow vote and barred from the subsequent general election, the quickest way to obtain a new electoral contest would be to support a recall of his successor. If the recalled official is allowed to run in the general election following his recall, on the other hand, the results are more likely to be accepted by both sides and the chances of recall during the subsequent term will be reduced. We mention this line of reasoning only to indicate that the deterrent effect of section 27521 on the frequency of recalls and therefore on the stability of local government is neither simple nor obvious.

More fundamentally, if the danger is repeated recalls, the appropriate remedy is limiting the frequency of the recall itself, not barring the candidacy of the recalled official. In fact, several of the provisions already mentioned do just that. Section 27500 prevents commencement of recall proceedings within the first six months of the official's term or within six months of the filing of recall petitions against him. Section 27513.5 prevents a recall election if the official's term would expire within six months following submission of the petitions. Thus breathing spaces are provided at the beginning and the end of an official's term and

---

[9]Section 27500 prevents filing of a notice of intention to recall if recall petitions have been filed within the preceding six months. In *Moore* v. *City Council*, 244 Cal.App.2d 892, 902 [53 Cal.Rptr. 603], this section was construed to apply only where the petitions were legally sufficient to compel a recall election. The rationale of *Moore* suggests that the six months should run from the election rather than from the filing of the petitions although the latter would be a more literal reading. If the literal interpretation is correct, however, then section 27500 would allow a new recall campaign to begin even less than six months after a recall election.

between recall efforts. Whether these periods are too long or too short is, in the first instance, a question for the Legislature. If they are perceived as inadequate, it would be a simple matter for the Legislature to lengthen the periods or otherwise modify them in order to prevent recalls from occurring too frequently. Such timing devices are constitutionally preferable because, although they limit to a degree the ability of the electorate as a whole to express its will, they operate in an impartial manner rather than by effectively disfranchising a portion of the electorate.

To assess the practical importance of section 27521, we have examined the recall systems applicable to other classes of elected officials in this state. Significantly, there are no similar disqualifications for candidacy with respect to recalled school officials,[10] recalled county officials,[11] or recalled state officials,[12] although a provision almost identical to section 27521 is found in the Uniform District Election Law.[13] A recalled county, state, or school official is free to run again for his position in any subsequent election, no matter how soon after the recall the election is held.[14] Although it is common knowledge that recall elections occur with great frequency in school districts, the Legislature has apparently not felt it necessary to the stability of governing boards of school districts that a recalled school official be disqualified from being a candidate for one year, six months, or any period at all.

We have carefully considered the arguments which have been presented or which we could imagine in favor of the constitutionality of.

---

[10]Procedures for recall of school officials are found in Education Code, section 1131 et seq.

[11]Procedures for recall of county officials are found in chapter 2 of division 14 of the Elections Code, section 27200 et seq. These procedures also apply to officials of any district not subject to the Uniform District Election Law.

[12]Procedures for recall of state officials are found in article XXIII of the state Constitution and chapter 1 of division 14 of the Elections Code, section 27000 et seq.

[13]The Uniform District Election Law is found in Elections Code, section 23500 et seq. It applies only where the principal act of a district so provides. The provision disqualifying recalled officials from candidacy for one year after recall is section 23654.

[14]When a county, state or school official is recalled, his successor is elected from among a group of nominees appearing on the same ballot which decides the recall question thus eliminating the need for a special election. To prevent confusion, the name of the official to be recalled may not appear among the nominees on the recall ballot. The city contends that by holding section 27521 unconstitutional we will be calling into question the validity of such provisions barring the name of the official to be recalled from appearing on the list of nominees. The contention lacks merit since a vote against the recall question is a vote for the challenged official and therefore the challenged official is a candidate even in the recall election.

section 27521 and are persuaded that they are either insubstantial or that the governmental interest involved could easily and conveniently be protected by means less burdensome to fundamental rights. We therefore conclude that section 27521 is unconstitutional.[15]

The order is affirmed as moot.

Kaufman, J., concurred.

**WHYTE, J.**[*]—I concur not only because the issue is moot but also because I believe it was correctly decided by the trial court. In my opinion Elections Code section 27521 is constitutional.

This section is a limitation on candidacy and only incidentally affects the right to vote. Under the latest cases neither the Supreme Court of the United States (*Bullock* v. *Carter* (1972) 405 U.S. 134 [31 L.Ed.2d 92, 92 S.Ct. 849]) nor the Supreme Court of California (*Knoll* v. *Davidson* (1974) 12 Cal.3d 335 [116 Cal.Rptr. 97, 525 P.2d 1273]; *Thompson* v. *Mellon* (1973) 9 Cal.3d 96 [107 Cal.Rptr. 20, 507 P.2d 628]) has been willing to accede a fundamental status to the right to be a candidate alone. Where the primary infringement is on the right of candidacy and the right to vote is only incidentally concerned, the test to be applied is, is the provision involved reasonably necessary to the accomplishment of legitimate state objectives. (*Bullock* v. *Carter, supra; Smith* v. *Evans* (1974) 42 Cal.App.3d 154, 158 [116 Cal.Rptr. 684].)

The prohibition, against a municipal officer who has been recalled again running for the same office within one year after the recall, found in Elections Code section 27521, is only a part of a general scheme regulating recalls. Other provisions prohibit filing a notice of intention to circulate a recall petition within the first six months of the official's term, nor within six months following the filing of a prior recall petition (Elec. Code, § 27500); a special recall election need not be called if a general election for the office is scheduled within six months of the filing of the recall petition (Elec. Code, § 27513.5).

All of these provisions seek to further the legitimate and substantial state interest in encouraging political stability. (*Storer* v. *Brown* (1974)

---

[15]As the discussion makes clear, our decision is not directed to that portion of section 27521 barring appointment of the recalled official and we express no opinion thereon.

[*]Retired judge of the superior court sitting under assignment by the Chairman of the Judicial Council.

415 U.S. 724 [39 L.Ed.2d 714, 94 S.Ct. 1274].) They aim to prevent a diversion of the energies of city officials from the business of governing by unnecessarily frequent and disquieting political campaigns. While reasonable opportunities for the voters to change or at least to attempt to change their governing bodies are essential, it is not essential that they should be given an immediate opportunity to undo what they have just done. This is particularly true where it could easily be a minority undoing what has very recently been accomplished by a majority. A majority vote is necessary to effectuate a recall, but at a general election which might be held soon thereafter only a plurality is required thereby allowing a minority to upset the recently declared will of the majority. More than 50 percent of the voters having said "we don't wish to be governed by this man," thus are forced to bow to a group which may be substantially less than 50 percent who say "but we do." Appellant suggests that this might be averted by providing for run-off elections. But in *Bullock* v. *Carter, supra,* 405 U.S. 134, 144 [31 L.Ed.2d 92, 100] the Supreme Court stated that it was a legitimate end of government to so regulate election ballots as to assure that "the winner is the choice of a majority, or at least a strong plurality of those voting without the expense and burden of run-off elections."

No suspect classification such as race, wealth, or curtailment of the right to travel is involved in the application of Elections Code section 27521. No substantial class of persons is involved. Only individuals on whose qualifications the voters have recently had an opportunity to express themselves are affected.

Neither the burden on the right to be a candidate nor on the right to vote is as great as were those involved and held constitutional in *Storer* v. *Brown, supra,* 415 U.S. 724; *Lippitt* v. *Cipollone* (N.D.Ohio 1971) 337 F.Supp. 1405 (affd. without opn.) (1972) 404 U.S. 1032 [30 L.Ed.2d 725, 92 S.Ct. 729] and *Maddox* v. *Fortson* (1970) 226 Ga. 71 [172 S.E.2d 595] (cert. den., 397 U.S. 149 [25 L.Ed.2d 183, 90 S.Ct. 999]).

As the ends, encouragement of stability in government and protection of the majority will, are legitimate state objectives and the means, postponement of the opportunity to vote for a particular individual for one year, is a reasonably necessary one I believe that statute is constitutional and should be upheld.

Respondent's petition for a hearing by the Supreme Court was denied March 26, 1975. Clark, J., was of the opinion that the petition should be granted.