Ronald E. BOLIN, et al., Appellants,

v.

STATE of Minnesota, DEPARTMENT
OF PUBLIC SAFETY and Commis-
sioner of Personnel, Respondents.

No. 51548.

Supreme Court of Minnesota.

Sept. 18, 1981.

Rehearing Denied Dec. 31, 1981.

Kurzman, Shapiro & Manahan, Marc G.
Kurzman and Lisa A. Berg, Minneapolis,
for appellants.

Warren Spannaus, Atty. Gen., James M.
Campbell and Andrea Mitau Kircher, Spec.
Asst. Attys. Gen., St. Paul, for respondents.

Minnesota Civil Liberties Union, amicus.

AMDAHL, Justice.

This is an appeal from an order of the
Ramsey County District Court ·declaring
that both Article XIV of the collective bar-

gaining agreement[1] reached between the Department of Public Safety and the Minnesota Highway Patrol Officers Association and the rules of the Department of Personnel are constitutional as they apply to plaintiff Bolin. We reverse.

Plaintiff Bolin has been a member of the State Highway Patrol since 1966. In February 1978, he submitted a written request to the Chief of the State Highway Patrol for an unpaid leave of absence, to extend from August 2, 1978, through August 29, 1978. The purpose of the leave was to enable the plaintiff to run for the office of Sherburne County Sheriff. Patrol Chief Crawford denied the request on the ground that Memo 75–59, issued in 1975 and later encompassed in Minnesota State Patrol Officers Policy Order PO77–10–030,[2] required troopers seeking the position of County Sheriff to resign from the Highway Patrol without prejudice. On March 3, 1978, plaintiff filed a written grievance with his district commander, pursuant to the collective bargaining agreement reached between the Minnesota Highway Patrol Officers Association and the Department of Personnel. Four days later, plaintiff's district commander informed the plaintiff that he was unable to resolve the grievance. Plaintiff then filed a written grievance with Patrol Chief Crawford, again in conformity with the collective bargaining agreement. Thereafter, a hearing was held before an arbitrator, pursuant to Article XVI of that agreement. Before receiving the arbitrator's decision, plaintiff submitted a second request for an unpaid leave, this one to extend from July 18, 1978, to November 8, 1978. On July 10, 1978, the arbitrator's decision came down. The arbitrator decided that the agreement was properly construed by the employer to permit a denial of plaintiff's request for a leave of absence. Plaintiff did not appeal from the arbitrator's decision at that time. Patrol Chief Crawford then denied plaintiff's second request for an unpaid leave of absence.

Plaintiff did not resign from the Patrol to actively run for the office of sheriff. An independent group did, however, conduct a write-in campaign on his behalf. He did not win the election, but did garner thirty percent of the vote in the three person race.

A new collective bargaining agreement was reached between the parties in May of 1979. The Association did not seek a change in the leave of absence provision of the agreement. In June 1979, plaintiff sought permission to appeal from the arbitrator's decision; this request was denied as untimely. Plaintiff then filed a summons and complaint in Ramsey County District Court against the respondents charging that the "resign to run" rule violated his first and fourteenth amendment rights under the United States Constitution. The case was tried before a district court judge who ruled that the leave of absence provision in the collective bargaining agreement was constitutional. That ruling is the subject of this appeal.

The issues presented by this case are whether the "resign to run" rule violates appellant's first or fourteenth amendment rights and whether appellant has waived his right to raise this constitutional challenge by virtue of his membership in the collective bargaining unit.

■ 1. While the right to run for public office has not been characterized as fundamental, it is an important right protected by the first amendment. *Bullock v. Carter*, 405 U.S. 134, 142–43, 92 S.Ct. 849, 855–56, 31 L.Ed.2d 92 (1972); *Hickman v. City of*

---

1. Article XIV deals with leaves of absence without pay.

2. Policy Order PO77–10–030 states in pertinent part:
   I. *Candidacy for Full-Time Elective Office, State Legislature, and County Sheriff*
   Any State Trooper before filing for such office or accepting appointment thereto must resign.
   a. Resignation is without prejudice.
   b. Resignee is eligible for Rehiring ahead of Trooper Candidate when opening occurs within one year following resignation.
   c. Following reappointment, he will be assigned to a station other than the station he was assigned to upon resignation * * *.

*Dallas,* 475 F.Supp. 137, 140 (N.D.Tex.1979). This right, however, is not absolute and may be subject to restriction, especially when government employees are the subject of the restriction. *Broadrick v. Oklahoma,* 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973); *United States Civil Service Commission v. National Association of Letter Carriers,* 413 U.S. 548, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973). Plaintiff argues that the restriction placed on his right to candidacy by the "resign to run" rule issued by the Chief of the State Patrol violates both his first and fourteenth amendment rights. We address the equal protection challenge first.

■ To determine whether the "resign to run" rule violates plaintiff's right to equal protection, "we must examine the character of the classification in question, the importance of the individual interests at stake, and the state interests asserted in support of the classification." *Illinois State Board of Elections v. Socialist Workers Party,* 440 U.S. 173, 183, 99 S.Ct. 983, 989, 59 L.Ed.2d 230 (1979). Application of this test to the rule under review requires that the "resign to run" rule be declared unconstitutional.

The "resign to run" rule establishes at least two classifications. It distinguishes between state troopers running for the office of sheriff and other law enforcement officers running for that position. It also differentiates between troopers running for the office of sheriff and troopers running for other county offices. These groups are similarly situated yet are treated differently. This alone, however, provides an insufficient basis for finding the classification unconstitutional. Examination of the interests affected must also be made.

Restrictions on access to the ballot burden two distinct and fundamental rights, "the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively." The freedom to associate as a political party, a right we have recognized as fundamental, has diminished practical value if the party can be kept off the ballot. Access restrictions also implicate the right to vote because, absent recourse to referendums, "voters can assert their preferences only through candidates or parties or both." By limiting the choices available to voters, the State impairs the voters' ability to express their political preferences. And for reasons too self-evident to warrant amplification here, we have often reiterated that voting is of the most fundamental significance under our constitutional structure.

When such vital individual rights are at stake, a State must establish that its classification is necessary to serve a compelling interest. * * * However, our previous opinions have also emphasized that "even when pursuing a legitimate interest, a State may not choose means that unnecessarily restrict constitutionally protected liberty," and we have required that States adopt the least drastic means to achieve their ends. This requirement is particularly important where restrictions on access to the ballot are involved. *Illinois State Board of Elections v. Socialist Workers Party,* 440 U.S. at 184–5, 99 S.Ct. at 990–91 (citations omitted).

■ We find that the state does have a compelling interest in the promotion of harmony and cooperation between the state highway patrol and the office of sheriff. The problem sought to be ameliorated by the "resign to run" rule is the tension or hostility likely to develop if a person employed as a highway patrolman is, at the same time, running for the office of sheriff. It is imperative that the highway patrolmen have a good relationship with the sheriffs in the working area. Highway patrolmen should be able to move in and out of the sheriff's headquarters in an atmosphere of mutual confidence and respect. Experience teaches that this desirable harmonious relationship is significantly disrupted when the patrolman runs against the sheriff; and it can be anticipated that the stresses and hostilities will survive the election. The state may, therefore, place reasonable restrictions on the right of state troopers to run for the office of sheriff. The restric-

tions placed on this right must, however, be the least restrictive means to achieve the goal. *Lubin v. Panish*, 415 U.S. ·709, 94 S.Ct. 1315, 39 L.Ed.2d 702 (1974).

The "resign to run" policy is not the least restrictive means available to accomplish the state's goal. To promote the harmony and cooperation between the office of sheriff and state troopers, it is necessary for the state to effect a separation between the state trooper running for the position of sheriff and the state patrol. In this way the state can minimize the potential for tension and hostility by ensuring that the two candidates do not have professional interaction at the time each is campaigning. This separation from service can be accomplished by requiring the trooper to take an unpaid leave of absence rather than requiring him to resign from the patrol.

The "resign to run" rule imposes heavy burdens on the trooper. Although when the trooper resigns under the rule he does so without prejudice, he does lose all seniority accumulated prior to his resignation. Seniority affects a trooper's ability to select vacation, to bid on transfers, and to request a special assignment. Loss of seniority may also result in his receiving additional overtime assignments. A trooper who is on leave of absence retains his seniority and therefore does not suffer these burdens.

Under the "resign to run" rule, a trooper who resigns may rejoin the force within 1 year of the effective date of his resignation. He must, however, wait for an opening before he can rejoin and there is no guarantee that an opening will occur within the 1-year time limitation. Moreover, the policy requires that when returning to the force the trooper may not be assigned to the post to which he was assigned prior to resignation. Any moving expenses required by the transfer must be borne by the trooper. These burdens do not attend an unpaid leave of absence.

The state has not shown that the additional hardships placed on troopers by the resignation rule are necessary to promote its interest in a cooperative and harmonious relationship between troopers and sheriffs.

The dissent advances the state's position that an unpaid leave of absence does not further the state's goal in that it makes it less onerous for a trooper to run for the office of sheriff. We are not unmindful of the potential for tension and hostilities to develop as a result of a state trooper's political challenge to a sheriff. This possibility, no matter how real, does not empower the state to make it as difficult as possible for the trooper to run. We must keep in mind both interests, that of the state *and* that of the trooper. Requiring the trooper to take an unpaid leave of absence will promote both. It will enable the trooper to run without undue hardships and it will enable the state to effect a separation between the trooper and the state patrol during candidacy.

The dissent's point that these potential hostilities might survive the election is well taken. However, a sheriff has the authority to request the reassignment of a trooper should the hostilities continue past the election. Therefore, requiring the trooper to take an unpaid leave of absence is the least restrictive means to accomplish the state's goal. We hold that the "resign to run" rule is unconstitutional on equal protection grounds. Because we find this rule to be in violation of plaintiff's fourteenth amendment rights, we need not address his first amendment challenge, other than as it relates to his equal protection challenge as discussed above.

■ 2. The state argues that the appellant has waived his right to complain about the violation of his constitutional rights by virtue of his membership in the collective bargaining unit, which has failed to seek a change in the challenged provision. The state advances this court's decision in *State ex rel. Johnson v. Independent School District No. 810*, 260 Minn. 237, 109 N.W.2d 596 (1961), for the proposition that a constitutional right may be waived, except when contrary to public policy. This premise is correct, but of no avail to respondent. This is a case where public policy militates against a finding of waiver for we are not here concerned solely with the rights of

appellant but with the right of the public to an effective vote as well.

Reversed.

SIMONETT, Justice (dissenting).

Disagreeing, as I do, with the majority's equal protection analysis, I must respectfully dissent.

The majority says that state troopers running for sheriff are similarly situated with other law enforcement officers running for sheriff and with state troopers running for other county offices. I do not think so.

The Minnesota Highway Patrol is a state-wide, uniformed police organization with limited jurisdiction. See Minn.Stat. ch. 299D (1980). There is no other class of state employees or law enforcement group quite like it. It is a relatively small unit, having an authorized strength of 504, but with high public visibility. Because of their unique position in the state service, the legislature has placed troopers in the unclassified service. Minn.Stat. § 43.28 (1980).

The legislature has instructed the highway patrol to have a close working relationship with local law enforcement personnel and "to cooperate, under instructions and regulations of the commissioner of public safety, with all sheriffs and other police officers * * *." Minn.Stat. § 299D.03 (1980). Troopers, testified the assistant patrol chief, "are guests in the individual facility, the sheriff's facility, and as a guest there we are obligated to follow his rules." State troopers at appellant's station necessarily must use the sheriff's jail facilities because no other exists in the county. They must rely on the sheriff's office for such things as driver's license and vehicle computer checks and breathalyzer machines. State troopers and the sheriff's office must assist each other regularly and their cooperation is crucial to effective law enforcement in the county.

Because of their training, propensities, high community visibility and close association with that office, state troopers are potential candidates for county sheriff. Like any election contest, those for county sheriff are often heated with each candidate critical of the other's record. The prospect that a state trooper may run against him, the actual experience of opposing a state trooper, the irritation of working with a former opponent—these factors can only be unsettling to a sheriff's department with which the highway patrol is seeking to have close rapport. It cannot be expected the sheriff will welcome the trooper as a guest in his facility if the guest has in mind becoming the host.

Election contests between state troopers and other law enforcement officials do not threaten the public welfare in the same way or degree as those between state troopers and sheriffs. These problems are unique and impinge on the very efficacy of the highway patrol. No other groups are similarly situated. Consequently, the "resign-to-run" rule, in distinguishing troopers from other law enforcement officers running for the office of county sheriff, has a rational basis and supports a compelling state interest.

The majority admits the validity of this distinction but contends the restrictions placed on a trooper's right to run for the office of sheriff must be the least restrictive means to achieve the recognized goal of harmonious relations between the two law enforcement groups. Balancing the individual's interests against the state's, they conclude an unpaid leave of absence is all the state justifiably can demand of a trooper running for office. It seems to me, however, that giving the trooper an unpaid leave of absence fails to protect the state's interests. If the trooper can take an unpaid leave of absence, he is even more likely to be a sheriff's rival, as the sheriff will quickly perceive. This alone can cause mischief. And if the trooper runs for election, loses, and stays in the community to run again, the harm is exacerbated. The fact the trooper may have conducted his campaign during a leave of absence rather than in a retirement status lessens the harm not at all.

Nor do I think a first amendment approach alters the case. From the state's

standpoint, the resign-to-run rule denies the public easy access to the highway patrol as a pool for experienced candidates for sheriff, but this restriction is justified by the public's compelling interest in promoting cooperation and harmony between the two agencies. From the trooper's standpoint, the rule impairs the trooper's right to vote for himself and of others to vote for him. Nevertheless, the right to run for office has not been held to be a fundamental right, and here, where core first amendment rights are not involved (the trooper is still free otherwise to be active politically), any infringement on the right to run for office has been subjected only to close, not strict, scrutiny. *Bullock v. Carter*, 405 U.S. 134, 146, 92 S.Ct. 849, 857, 31 L.Ed.2d 92 (1973); *Morial v. Judiciary Commission of the State of Louisiana*, 565 F.2d 295, 301–02 (5th Cir. 1977). *See also Johnson v. State Civil Service Department*, 280 Minn. 61, 157 N.W.2d 747 (1968), where we upheld, against a first amendment attack, a state statute requiring classified state employees to resign upon filing for public office.

Applying close scrutiny, the Supreme Court upheld the Hatch Act in the face of numerous challenges, stating that Congress had the power to proscribe all partisan political activity by federal employees, including running for public office. *United States Civil Service Comm. v. National Ass'n of Letter Carriers*, 413 U.S. 548, 556, 93 S.Ct. 2880, 2886, 37 L.Ed.2d 796 (1973). A state rule demanding judges resign before running for nonjudicial office was upheld under similar scrutiny in *Morial*. Michigan also requires its state patrol officers to resign before running for sheriff, as permitted under Mich.Stat.Ann. § 28.10 (1978).

The majority cites no case to the contrary, relying instead on *Illinois State Board of Elections v. Socialist Workers*, 440 U.S. 173, 99 S.Ct. 983, 59 L.Ed.2d 230 (1979), a decision that did not involve a resign-to-run rule. There an anomaly in the state election code resulted in a new party or an independent candidate needing more signatures to get on the ballot for a Chicago city election than for a statewide election. The

state was unable to show any compelling reason why this should be so, and it was held, insofar as the number of signatures required to get on the ballot in Chicago, that equal protection required the least drastic means to be used for access to the ballot and that the state could require no more signatures for a city election than a statewide election. But as Justice Blackmun says in his concurring opinion in *Illinois State Board of Elections*, the formula of "least drastic [or restrictive] means" is "a slippery slope" and not always helpful. Here, for example, it might be said giving the trooper who resigns a qualified right to return to the patrol is the least drastic approach. But more to the point, while the alternative of an unpaid leave of absence is plainly much less restrictive, it is also no means at all to the end to be achieved. If the public interest in preserving the integrity of the civil service system is sufficient to keep a federal employee from participating in any partisan political activity, it would seem the state's interest in preserving the integrity of its highway patrol is sufficiently compelling to justify the less drastic resign-to-run rule. In this context, the test is more properly whether, in light of the rights affected, the resign-to-run rule is reasonably tailored to the state's legitimate interest. *Morial v. Judiciary Commission of the State of Louisiana*, 565 F.2d 295, 302 (5th Cir. 1977).

We must look, then, at the rule. The trooper who resigns may rejoin within 1 year if there is an opening. He loses seniority, which affects overtime assignments, vacation and transfer rights. If he does return to the patrol, he must be assigned to a new post and pay his own moving expenses. These are hard conditions, but they must be if the potential for rivalry with the sheriff's office is to be meaningfully curtailed. Even so, the rule is not as onerous as the resign-to-run rule upheld in Louisiana where a judge who resigns to run for mayor has not even a qualified right to return to his judicial position. *Morial, supra.*

While it may be unnecessarily harsh to require a trooper to pay his own moving expenses to a new post, this item does not rise to the stature of a constitutional infirmity. This seems to me one of the details to be resolved at the bargaining table, and it is of some significance that, in its last round of contract bargaining, the officers' association did not attempt to change the resign-to-run rule in any respect.

The only issue before us is the validity of the resign-to-run rule as it applies to troopers running for the office of local sheriff. The patrol chief's policy order, however, indicates he might apply the resign-to-run rule to other full-time elective offices or for the state legislature. I would have trouble with the rule if so applied, for the underlying considerations would then be different. *See Mancuso v. Taft*, 476 F.2d 187 (1st Cir. 1973). But here I do not consider application of the rule unconstitutional and would affirm the lower court.

SHERAN, Chief Justice (dissenting).

I join in the dissent of Justice Simonett.

OTIS, Justice (dissenting).

I join in the dissent of Justice Simonett.

PETERSON, Justice (dissenting).

I join in the dissent of Justice Simonett.