**Curtis FOSTER, Plaintiff,**

**v.**

**Stanley KUSPER, in his capacity as County Clerk of Cook County, Illinois State Board of Elections, Michael Hamblet, J. Phil Gilbert, Richard Cowens, Theresa Petrone, Norma Shapiro, Carolyn Eyre, Joshua Logan, John Lanigan, in their capacity as members of the Board, J. Robert Barr, in his capacity as Cook County Chairman of the Republican Party and Ronald Miller, Defendants.**

**No. 84 C 2797.**

United States District Court,
N.D. Illinois, E.D.

May 31, 1984.

Larry Saska and William C. Starke, Chicago, Ill., for plaintiff.

Vincent James Tenuto, Asst. Gen. Counsel, St. Bd. of Elections; Michael C. Moses, Asst. State's Atty., Richard M. Daley, Cook Co. State's Atty., Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Curtis Foster ("Foster") has sued a number of defendants [1] for declaratory and injunctive relief against the operation of the last paragraph of Illinois Election Code ("Code") § 7–59, Ill.Rev.Stat. ch. 46, ¶ 7–59, to bar him from the Republican ward committeemanship of Chicago's 28th Ward. After issuing a temporary restraining order April 2, 1984 (the day suit was filed), this Court conducted an April 11 preliminary injunction hearing that—by agreement of the parties—is being treated as the hearing on the ultimate merits.[2] For the reasons stated in this memorandum opinion and order, Foster is entitled to the relief he seeks.

### Facts

Under Code § 7–10, the March 20, 1984 primary nominating petitions for a 28th Ward Republican ward committeeman can-

didate were required to have 96 signatures.[3] Foster, then the incumbent committeeman, was barred from the 1984 ballot because his nominating petitions lacked the necessary number of valid signatures. Consequently he had to run as a write-in candidate. Three other candidates did muster the necessary signatures and were on the ballot.

When the election was over the Board canvass proclaimed these vote totals (all those receiving votes, other than Foster, had been listed on the ballot):

| | |
|---|---|
| Rickey Prince | 22 votes |
| Ronald Miller ("Miller") | 36 votes |
| Marie Goodlow | 19 votes |
| Curtis Foster | 80 votes |

Even though Foster had not only a plurality but an actual majority of the votes cast (the other three candidates having aggregated 77 votes), Miller was certified the winner. That result was compelled by the fact Foster had fewer than the same 96-vote total required for nominating petitions, for Code § 7–59 reads in part:

Notwithstanding any other provisions of this Section, a person whose name was not printed on the primary ballot as a candidate for nomination for or election to an office, is not nominated for or elected to that office as a result of a write-in vote at the primary unless the number of votes he received equals or exceeds the number of signatures required on a petition for nomination for that office.

### Miller's Status

At the conclusion of the hearing this Court indicated Miller's certification could

1. On April 5, without objection from Foster's counsel, Chicago's Board of Election Commissioners ("Board") and its members were dismissed as defendants.

2. After the April 11 hearing this Court inquired whether the litigants would concur in letting the record at the hearing become the complete record for disposition on the merits (because the relevant facts were really not in dispute). Foster's counsel and the Assistant Attorney General promptly responded that would be wholly acceptable, subject to the latter's tendering of

some additional documentary evidence by agreement. That has been done. Now in response to this Court's renewed inquiry, the Cook County State's Attorney has agreed to the suggested treatment and Miller has posed no objection.

3. At the most recent regular election (the 1983 mayoral election) the highest number of votes in the 28th Ward for any Republican candidate was 960 (see Code § 7–10(k)). Code § 7–10(i) then required 10% of that number for the ward committeeman nominating petitions.

not be sustained no matter what Foster's legal situation proved to be.[4] That result is mandated by Illinois (not federal) law. *Durham v. Barrett*, 15 Ill.App.3d 1011, 305 N.E.2d 201 (1st Dist.1973) taught the runnerup to a disqualified ward committeeman candidate could not compel his own certification. Although the specific statutory provision involved in *Durham* (Code § 23–29) is not implicated here, the *meaning* of the statute here (an earlier paragraph of Code § 7–59) is clearly the same:

> The person receiving the highest number of votes of his party for precinct committeeman of his precinct shall be declared elected precinct committeeman from said precinct.

Whatever else may be said of Miller, he did not "receiv[e] the highest number of votes...." Foster did, even if he may be disqualified because of the other aspect of Code § 7–59. If Foster were not to prevail here, the result (as in *Durham*) would simply be the election of no one, triggering the need for another election.

But *Pennhurst State School & Hospital v. Halderman*, —— U.S. ——, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984) would foreclose this Court from compelling the official defendants to decertify Miller on such state law grounds. Both for that reason and because Foster's primary focus is understandably on his own right to the office, this opinion proceeds to that issue.

---

**4.** Foster sues both as a candidate and as one of the group of voters whose franchise has been vitiated by the challenged provision of the Code. At least in the latter capacity he has standing to challenge Miller's right to the office on state grounds (as a pendent claim), even if no federal constitutional right were implicated by certifying Miller. But under the strictures of *Pennhurst* (discussed later in the text) that challenge could be asserted only vis-a-vis Miller himself, for it could not result in the granting of relief against the officials. Thus Foster's right (in federal court terms) would likely be an empty one.

**5.** This analysis has considered and rejected the first-impression reaction arrived at by this Court's colleague Judge Aspen in denying a preliminary injunction and writ of mandamus in *Smith v. Board of Election Commissioners*, 84 C 148, slip op. at 3–4 (Apr. 2, 1984). As Judge

---

*Foster's Status* [5]

Neither the right to be a candidate (*Bullock v. Carter*, 405 U.S. 134, 142–43, 92 S.Ct. 849, 855–56, 31 L.Ed.2d 92 (1972)) nor even to vote (*Rodriguez v. Popular Democratic Party*, 457 U.S. 1, 9, 102 S.Ct. 2194, 2199, 72 L.Ed.2d 628 (1982)) is a fundamental constitutional right. But voting serves directly one of the most fundamental rights in a democratic society: that of freedom of association. *Kusper v. Pontikes*, 414 U.S. 51, 56–57, 94 S.Ct. 303, 307, 38 L.Ed.2d 260 (1973); *Lubin v. Panish*, 415 U.S. 709, 716, 94 S.Ct. 1315, 1320, 39 L.Ed.2d 702 (1974).

What is at work here is not merely the potential deprivation of Foster's claim to political office but the potential disenfranchisement of a majority of those who chose to vote in the election. Those *voters* are subjected to a wholly different and more restrictive measure of their vote-effectiveness than persons who have chosen to vote for any of the three candidates listed on the ballot.

That difference in treatment, that less-than-equal protection of the laws, might well call for application of the "strict scrutiny" test of constitutionality. At a minimum it would seem to invoke the process defined last year by the Supreme Court in a ballot access case, *Anderson v. Celebrezze*, 460 U.S. 780, 103 S.Ct. 1564, 1570, 75 L.Ed.2d 547 (1983) (citations omitted): [6]

---

Aspen there recognized, he was confronted with the need for a quick decision without the benefit of "a more detailed factual record," so that "the constitutional validity of [Code § 7–59] will have to await a more complete consideration on the merits and facts of this case." This opinion essays such "complete consideration."

**6.** Defendants urge (Mem. 4–6) the applicability of the *Anderson* test, then proceed (Mem. 6–16) to analyze this case in those terms—though their analysis is fatally flawed for the reasons discussed in the text of this opinion. Of course the statute's failure to meet the *Anderson* standard would a fortiori lead to its invalidity under "strict scrutiny." Indeed as the analysis that follows in the text demonstrates, Foster would be successful even if the usual "rational basis" criterion in equal protection cases were to be applied.

Constitutional challenges to specific provisions of a State's election laws therefore cannot be resolved by any "litmus-paper test" that will separate valid from invalid restrictions.... Instead, a court must resolve such a challenge by an analytical process that parallels its work in ordinary litigation. It must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate. It then must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule. In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests; it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights. Only after weighing all these factors is the reviewing court in a position to decide whether the challenged provision is unconstitutional.... The results of this evaluation will not be automatic; as we have recognized, there is "no substitute for the hard judgments that must be made."

All the State has put forward here as purported "justification for the burden imposed by its rule" is the desire (a wholly legitimate one) to thwart the frivolous candidate. Indeed that concern legitimizes the ballot *listing* requirement of Code § 7–10(i).[7] But any degree of thought confirms that it has no relationship at all to barring the *election* of an unlisted candidate.[8]

Were the requirement designed to guarantee at least minimal support where no one is listed on the ballot, it would certainly serve a legitimate interest: All of us recall newspaper accounts of elections in which (for example) only one voter has cast a ballot and has thus elected himself township supervisor, dogcatcher or what have you. In fact (though defendants have not suggested the possibility) similar concerns might perhaps apply where only one candidate is on the ballot: Voters might be lulled into a false sense of security and simply not show up at the polls on the assumption there was no contest, only to have a sub rosa write-in campaign steal the election.

That kind of analysis breaks down entirely where, as here, the ballot lists several candidates. No one who did not exercise the franchise can be heard to say he or she refrained from doing so because of confidence his or her preferred candidate was in no danger of defeat. Or to put the matter differently, if the candidate who overcomes the handicap of absence from the ballot and still garners 80 write-in votes is to be labeled "frivolous," what should be said of the candidate who—with the advantage of being listed on the ballot—musters just 36 or 22 or 19 votes?

All the constitutional cases treating with the right to vote (more precisely, the freedom of association exemplified and implemented by voting) have focused on protecting the rights of those who actually come out on election day to cast their ballots, not the inchoate (more accurately, unexercised)

---

**7.** See Judge Aspen's other recent opinion in *Smith,* slip op. (Mar. 9, 1984). That opinion invalidated the 10% ballot access provision indirectly involved in this case, but only because it was twice as strict as the 5% requirement for township committeeman—an office Judge Aspen found indistinguishable from ward committeeman for these purposes. This opinion later identifies that holding as an alternative ground available to support Foster's position here.

**8.** Defendants' Memorandum spends the bulk of its time and space in urging the validity of the ballot listing requirement. Then Mem. 18–19 asserts a quick (and impermissible) leap of faith to the election requirement:

> Since it is undisputed that a minimum signature requirement can be imposed upon a candidate who wishes to have his name appear on the ballot, would not the same interests be served by requiring a write-in candidate to obtain as many votes as signatures needed in order for his name to appear on the ballot at the general election? Certainly it would be confusing to the voter and discourage future participation in the electoral process if a candidate were to be declared nominated by merely obtaining a handful of votes.

As the following text discussion shows, analysis rather than defendants' a priori assertion demonstrates the emptiness of the asserted parallel.

rights of those who are free to vote but voluntarily choose not to do so. That protection is of course the entire thrust of the one-person-one-vote cases, with their prohibition of different weighting of those who *exercise* their franchise. This opinion has identified one possible exception to that focus: members of the electorate who might forego voting in justifiable reliance on an apparently foregone conclusion that an *unopposed* candidate will win. But that potential justification vanishes in the context of an election known to be contested—like this one.

In this case Miller had the requisite 96 signatures to have his name placed on the ballot, but at least 60 (and almost certainly more) of those signatories did not cast votes for Miller despite the fact the election was contested.[9] Surely those nonvoting signatories could not now be heard to object that their *signatures* should count as *votes* for the purpose of outweighing Foster's 80 write-in votes and preventing his being seated. That would distort one-person-one-vote principles beyond recognition.

In sum, it might be possible for the Illinois General Assembly to have shaped a statute narrowly drawn to counter the asserted evil of the frivolous candidate in other contexts. It has not done so. No legitimate justification has been tendered

for the burden imposed on the disenfranchised supporters of Foster for the ward committeemanship. As applied to bar Foster from that office, the last paragraph of Code § 7–59 is unconstitutional.[10]

There is an alternative road that would lead to the same destination. Judge Aspen has recently held the 10% ballot access requirement unconstitutional, upholding instead the 5% requirement the same statute sets up for township committeemen (*Smith v. Board of Election Commissioners*, 587 F.Supp. 1136, 1148–51). Foster's 80 votes exceed the 48-vote minimum that a 5% (rather than 10%) measure would require. Accordingly if Judge Aspen's opinion is upheld on appeal (which is now pending), Foster would not be disqualified even were the minimum-vote requirement of Code § 7–59 alone viewed as constitutional.

Thus Foster prevails if either or both of (1) the last paragraph of Code § 7–59 and (2) the 10% requirement of Code § 7–10(i) is or are unconstitutional. Because this Court has found the former invalid, it need not reach the latter question.

### Conclusion

This Court declares the last paragraph of Ill.Rev.Stat. ch. 46, ¶ 7–59 unconstitutional.[11] It orders defendants to certify that

9. There are of course a host of reasons that could explain that phenomenon. Qualified voters are free to sign more than one nominating petition if they wish, then exercise their real choice when it counts: in the election. More significantly, the whole concept of the electoral process—nomination, campaign, election—contemplates the informed exercise of the franchise. Miller's petition signers are free to become Foster voters in the voting booth. And of course it takes a different kind of commitment to go to the polls to register a choice than simply to sign a paper someone brings to you. Under our system, only the commitment expressed at the polls counts.

10. Defendants point to *State ex rel. McIntyre v. Mininni*, 32 Ohio St.2d 17, 288 N.E.2d 816 (1972), which contains a dictum that might be read as confirming the validity of a provision like that in Code § 7–59. Two comments are appropriate. First, the actual *holding* in *McIntyre* was to *invalidate* a law that required a write-in candidate (but not a candidate listed on

the ballot) to receive a specified number of votes in order to be nominated. That *holding* would in fact *support* the conclusion reached here. Second, the court's passing comment that the write-in candidate had received more votes than would have been required for his name to be printed on the ballot was only that—a passing comment. *McIntyre* had no occasion to consider, or even discuss, the issues addressed in this opinion.

11. In a last-gasp effort to salvage the last paragraph of Code § 7–59 for another day (and other litigation), Defendants' Mem. 28–30 asks this Court specifically to declare the statute at worst unconstitutional as applied rather than on its face. But as the earlier text discussion suggests, that request essentially calls on this Court to draft a statute the Illinois General Assembly has not chosen to enact—or put another way, to render an advisory opinion on facts *not* before this Court (rather than limiting this opinion to the facts that are). Neither of those roles is

Curtis Foster and not Ronald Miller is the duly elected 28th Ward Republican Ward Committeeman as a result of the March 20, 1984 election.

acceptable. This opinion must be read for what it is—no more, no less—and questions as to other possible applications of Code § 7–59 must await resolution by a future court as and when presented with them.